The STATE of Texas and Office of Public Utility Counsel, Petitioners,

v.

**PUBLIC UTILITY COMMISSION OF TEXAS and Central Power and Light Company, Respondents.**

The STATE of Texas and Office of Public Utility Counsel, Petitioners,

v.

**PUBLIC UTILITY COMMISSION OF TEXAS and Houston Lighting and Power Company, Respondents.**

Nos. D–3154, D–3155.

Supreme Court of Texas.

Argued Sept. 13, 1993.

Decided June 22, 1994.

Rehearing Overruled Oct. 6, 1994.

Luis A. Wilmot, San Antonio, Stephen Fogel, William L. Magness, Richard A. Muscat, Joe K. Crews, Dan Morales, Austin, for petitioners in No. D-3154.

Davison W. Grant, Joen N. Pratt, Austin, Ferd C. Meyer, Jr., Kenneth C. Raney, Jr., Dallas, R. Eden Martin, Thomas W. Merrill, Chicago, IL, William N. Woolsey, Austin, Harry M. Reasoner, Houston, Dan Morales, Norma K. Scogin, James M. Phillips, Austin, for respondents in No. D-3154.

Luis A. Wilmot, San Antonio, Stephen Fogel, William L. Magness, Dan Morales, Rupaco T. Gonzalez, W. Scott McCollough, Richard A. Muscat, Joe K. Crews, Austin, for petitioners in No. D-3155.

Hugh Rice Kelly, Houston, Robert J. Hearon, Robin A. Melvin, Austin, George W. Schalles, III, Houston, Selden Anne Wallace, Norma K. Scogin, Dan Morales, Austin, for respondents in No. D-3155.

ENOCH, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, and HIGHTOWER, HECHT and CORNYN, Justices, join.

These two causes were submitted together because both involve the Public Utility Commission's (Commission) treatment of various costs associated with the operation of a newly constructed nuclear power plant.[1] The ques-

---

1. The present disputes arise from the following three Commission orders: Tex. Public Utils. Comm'n, *Application of Central Power and Light Co. for Approval of Deferred Accounting Treatment of Certain Costs Related to the South Texas Nuclear Project No. 1,* Docket No. 7560, 14 Tex P.U.C.Bull. 2669 (April 19, 1989) (Docket No. 7560); Tex. Public Utils. Comm'n, *Petition of*

tion presented by each case is whether the Commission has the authority under the Public Utility Regulatory Act (PURA)[2] to allow a public utility to defer certain costs incurred during the "regulatory lag" period in order to protect the utility's financial integrity.[3] We answer this yes, and consequently affirm the judgment of the court of appeals in part and reverse and remand in part.

In 1972, Central Power and Light Company (CP & L), Houston Lighting and Power Company (HL & P), the City of Austin, and the City of San Antonio began construction of a two-unit nuclear powered electricity generating station in Matagorda County, Texas, known as the South Texas Project. Unit One of the project (STP–1) was completed and began commercial operation on August 25, 1988. Under standard accounting procedures, CP & L and HL & P would have stopped accruing carrying costs on their invested funds and would have begun charging operations and maintenance, depreciation, insurance and taxes (collectively "operating costs") as expenses against income at this time. During the interval between the time STP–1 was placed in service and the time the investment in the plant would be included in rate base (i.e., the "regulatory-lag" period), HL & P and CP & L would have incurred carrying costs and operating costs on their invested funds that they would never recover. As a result, both CP & L and HL & P applied to the Commission for deferred-accounting treatment of such costs during the regulatory lag period.

In Docket No. 7560 the Commission granted CP & L's request for deferred accounting treatment for a period from August 25, 1988,

to no later than February 15, 1990. In Docket No. 8230 the Commission granted HL & P's request for deferred accounting treatment from August 25, 1988, through the earlier of either the date rates which reflect those costs became effective or November 23, 1989. The order also provided that if by November 23, 1989, rates were not in effect to reflect the prudently incurred costs of the plant, HL & P could file a petition to request an extension of the deferral period beyond that date. Later, in Docket No. 9010, the Commission extended HL & P's deferral period beyond November 23, 1989, until such time as the cost of STP–1 was reflected in rates approved by the Commission. By granting deferred accounting treatment during such time periods, the Commission allowed CP & L and HL & P to capitalize their costs associated with STP–1 during those periods and carry them as separate assets on their balance sheets. The reasonableness of the amount of the costs was to be determined by the Commission in a separate ratemaking proceeding in which the balance-sheet asset consisting of the deferred costs would be reviewed using the same criteria as any other asset.

The State of Texas on behalf of certain State agencies, and the Office of Public Utility Counsel (OPUC) sought judicial review of the Commission's orders granting deferred accounting treatment to CP & L and HL & P. The trial court upheld all three orders. The court of appeals affirmed the portion of the trial court's judgment which affirmed the Commission's order allowing the deferral of post-in-service operating costs. 840 S.W.2d 650, 657. The court of appeals reversed the portion of the trial court's judgment which

---

*Houston Lighting and Power Company for Approval of Deferred Accounting Treatment for Limestone Unit 2 and the South Texas Project Unit 1,* Docket No. 8230, 14 Tex.P.U.C.Bull. 2752 (April 19, 1989) (Docket No. 8230); and Tex. Public Utils. Comm'n, *Petition of Houston Lighting and Power Company to Continue Deferred Accounting Treatment for STP Unit One Beyond November 23, 1989,* Docket No. 9010, 15 Tex.P.U.C.Bull. 1905 (February 28, 1990) (Docket No. 9010).

**2.** Tex.Rev.Civ.Stat.Ann. art. 1446c (Vernon Supp. 1994).

**3.** Generally, regulatory lag is the delay between the time when a utility's profits are above or

below standard and the time when an offsetting rate decrease or rate increase may be put into effect by commission order or otherwise. This delay is due to the inherent inability in the regulatory process to allow for immediate rate decreases or increases. For purposes of this opinion, "regulatory lag" is the period between the date a new plant begins commercial operation (the "in-service" date) and the effective date of the new rates that result from including the new plant's costs in the rate base. *See* James C. Bonbright et al., Principles of Public Utility Rates 96 (2d ed. 1988).

affirmed the Commission's order allowing the deferral of post-in-service carrying costs.[4] *Id.* All parties filed applications for writ of error in this court. For the reasons stated below, we reverse the judgment of the court of appeals to the extent that it disallows the deferral of post-in-service carrying costs and remand this cause to the court of appeals for further proceedings consistent with this opinion. In all other respects, the judgment of the court of appeals is affirmed.

## I.

## A.

### The Public Utility Regulatory Act

■ As a general rule, an administrative agency is a creation of the legislature and, as such, has only those powers expressly conferred and those necessary to accomplish its duties. *State v. Jackson,* 376 S.W.2d 341, 344 (Tex.1964); *Sexton v. Mount Olivet Cemetery Ass'n,* 720 S.W.2d 129, 137 (Tex.App.— Austin 1986, writ ref'd n.r.e.). This Court must determine the scope of the Commission's authority under the Public Utility Regulatory Act (PURA), both express and implied, and must determine whether the Commission's actions comported with this grant of authority. TEX.GOV'T CODE ANN. § 2001.- 174 (Vernon Pamphlet 1994). *See* Public Utility Regulatory Act, TEX.REV.CIV.STAT. ANN. art. 1446c, §§ 4, 16 (Vernon Supp.1994).

PURA section 27 grants to the Commission broad authority in setting and defining a utility's system of accounts. Specifically, under PURA section 27(a), the Commission has the power to prescribe forms of books and accounts "which in the judgment of the Commission may be necessary to carry out any of the provisions of" PURA.[5] Thus, section 27 provides authority for the Commission to determine the manner in which specific expenditures are to be recorded in carrying out the provisions of PURA.[6] This includes section 39(a). Section 39(a) requires the Commission to set, as a *minimum* lawful rate, revenues at a level which will permit the

4. The court of appeals separated the costs into two categories: (1) depreciation, operation and maintenance, insurance, and tax costs; and (2) carrying costs. Our holding makes no distinction between these costs.

5. PURA's only limit to this authority prohibits the Commission from creating a system of accounts that conflicts with that established by a federal agency for that utility. TEX.REV.CIV.STAT. ANN. art. 1446c § 27(a). Accordingly, the Commission has directed that utilities generally must follow the Federal Energy Regulatory Commission (FERC) Uniform System of Accounts. *See* 16 TEX.ADMIN.CODE § 23.12(a)(2)(B) (West 1994). The FERC Uniform System of Accounts specifically provides for the recognition of deferred cost assets. *See* 18 C.F.R. Part 101 (1993). Further, generally accepted accounting procedures recognize and allow for the deferral and capitalization of expenses. *See* ACCOUNTING FOR THE EFFECTS OF CERTAIN TYPES OF REGULATION, Statement of Financial Accounting Standards No. 71 (Fin. Accounting Standards Bd.1982).

6. A constant theme running throughout both the State's and OPUC's briefs is the argument that there is a fundamental distinction between invested capital and expenses. However, there is no inherent or fundamental characteristic that *determines* whether a particular expenditure is an expense or a capital investment. Indeed, one of the primary objectives of accounting regulation is to distinguish between expenditures that should be expensed currently or capitalized and recovered over a future period of time. CHARLES F. PHILLIPS, JR., THE REGULATION OF PUBLIC UTILITIES 206 (2d ed. 1988) ("accounting regulation is needed so as to distinguish between expenditures that should be charged to capital and those that should be charged to income"); JAMES C. BONBRIGHT ET AL., PRINCIPLES OF PUBLIC UTILITY RATES 256 (2d ed. 1988). *See* ACCOUNTING FOR THE EFFECTS OF CERTAIN TYPES OF REGULATION, Statement of Financial Accounting Standards No. 71, para. 9 (Fin. Accounting Standards Bd.1982). PURA grants to the Commission broad authority concerning accounting policy. TEX.REV.CIV.STAT.ANN. art. 1446c, § 27. We recognize that uniformity is necessary in determining expenditures that should be charged to capital and those that should be charged against income. At the same time, the appropriate classification of a particular expenditure as capital or expense is dependent on the circumstances associated with the outlay. *See* BONBRIGHT, at 256; *see also Norfolk & Western Railway Co. v. United States,* 287 U.S. 134, 141, 53 S.Ct. 52, 54, 77 L.Ed. 218 (1932) (Interstate Commerce Commission, which is authorized to prescribe a uniform system of accounts pursuant to section 20 of the Interstate Commerce Commission Act, has authority to make special accounting classifications to fit exceptional situations). We conclude that the complex decisions concerning this determination are better left to the agency created to centralize expertise in this area and granted broad authority concerning just such matters. *See City of El Paso v. Public Util. Comm'n,* 609 S.W.2d 574, 579 (Tex.App.—Austin 1980, writ ref'd n.r.e.).

utility "a reasonable opportunity to earn a reasonable return on its invested capital used and useful in rendering service to the public over and above [the utility's] reasonable and necessary operating expenses." [7] TEX.REV.CIV.STAT.ANN. art. 1446c, § 39(a); *see also Railroad Comm'n of Texas v. Lone Star Gas Co.,* 656 S.W.2d 421, 426 (Tex.1983). By allowing the deferral of costs incurred during the regulatory lag period, the Com-

mission has provided a mechanism, through accounting procedures under section 27, to ensure that the requirements of section 39 are met. This is within the Commission's authority under PURA.[8]

 The State and the OPUC contend that because the deferral of post-in-service costs is not explicitly included in PURA section 43 as a remedy for regulatory lag, the Commission exceeded its authority by pro-

---

7. Section 39(a) provides in part:
 ... the regulatory authority shall fix its overall revenues at a level which will permit such utility a reasonable opportunity to earn a reasonable return on its invested capital used and useful in rendering service to the public over and above its reasonable and necessary operating expenses.
 TEX.REV.CIV.STAT.ANN. art. 1446c, § 39(a).

8. At oral argument the State recognized that deferred accounting may be appropriate in certain circumstances. We note that deferred accounting treatment has been authorized by the vast majority of utility commissions that have addressed this issue. *E.g., Re Arizona Public Service Co.,* 91 P.U.R.4th 399, 405 (April 6, 1988) (deferred accounting authorized where it was found that such accounting would preserve the financial integrity of the utility); *Re Arizona Public Service Co.,* 79 P.U.R.4th 258, 262–63 (Dec. 5, 1986) (deferred accounting treatment authorized to preserve post-in-service costs occurring between the time the new plant became commercially operable and the time it was recognized in rate base); *Re Georgia Power Co.,* 79 P.U.R.4th 604, 606–07 (Dec. 16, 1986) (utility commission ordered utility to defer post-in-service costs until subsequent rate hearing in order to prevent loss of income); *Re Commonwealth Edison Co.,* 103 P.U.R.4th 80, 91–93 (June 1, 1989) (utility allowed to continue to accrue allowance for funds used during construction and to defer depreciation after nuclear generation plant's in-service date and until such time as plant costs would be reflected in rates where necessary to avoid significant and adverse impact on the utility's earnings as well as its short-term and long-term cost of capital); *Re Northern Indiana Public Service Co.,* 71 P.U.R.4th 462, 467 (Nov. 27, 1985) (utility allowed to continue to accrue carrying charges on the cost of a generating plant from the in-service date of the plant until the plant was included in rate base); *Re Kentucky Power Co.,* 64 P.U.R.4th 56, 87–88 (Dec. 4, 1984) (utility allowed to continue to accrue allowance for funds used during construction and depreciation of plant from the in-service date until the effective date of rates where the utility commission found that the utility would never recover the capital costs incurred during that period absent the accounting modification); *Ex Parte Gulf States Utilities, Co.,* 80 P.U.R.4th 370, 375 (Dec. 11, 1986) (Louisiana) (utility commission allowed

utility to defer and accrue in a separate account all carrying and operation costs associated with a new nuclear generation plant from the date of commercial operations until the date rates became effective); *Re Western Massachusetts Electric Co.,* 80 P.U.R.4th 479, 543–45 (June 30, 1986) (utility allowed to defer post-in-service operation and maintenance costs, depreciation, taxes, and carrying charges); *Re Sierra Pacific Power Co.,* 73 P.U.R.4th 306, 380–81 (Oct. 28, 1985) (Nevada) (allowance for funds used during construction and depreciation expense incurred after the plant's in-service date and prior to the effective date of the new rate order authorized so that the regulatory lag associated with the use of an historic test period did not cause significant shortfall in utility's earnings); *Office of Consumers' Counsel v. Public Utils. Comm'n of Ohio,* 18 Ohio St.3d 264, 480 N.E.2d 1105, 1106–08 (1985) (affirming utility commission's authorization of deferred accounting treatment); *Re Public Service Co. of Oklahoma,* 67 P.U.R.4th 316, 319 (April 29, 1985) (utility allowed to continue to accrue allowance for funds used during construction and depreciation after commercial operation date); *Re Duke Power Co.,* 79 P.U.R.4th 145, 166–67 (Nov. 5, 1986) (setting amortization schedule in rate hearing for deferred post-in-service costs); *see also Re United Illuminating Co.,* 74 P.U.R.4th 27 (May 6, 1986) (Connecticut) (where there is a delay between the date that a nuclear electric generating facility is placed in commercial operation and the date of the first rate case decision in which the new plant investment is recognized, alternative accounting treatment may be used to avoid serious impact upon the utility's net earnings); *Re Carolina Power & Light Co.,* 77 P.U.R.4th 203, 208–09 (July 24, 1986) (South Carolina) (where rate base phase-in procedure was approved so that 50% of the rate increase would be phased in, the electric utility was entitled to accrue allowance for funds used during construction for future rate making purposes on that portion of the plant which was not included in rate base); *Re Puget Sound Power and Light Co.,* 62 P.U.R.4th 436 (Sept. 28, 1984) (the commission denied a petition to allow a utility to continue to accrue allowance for funds used during construction after the plant was placed in service, but did not preclude the authorization of such relief under appropriate circumstances).

viding a remedy for regulatory lag not contemplated by the legislature.[9] We disagree. In ascertaining the scope of the Commission's authority, we must read PURA as a whole to ascertain the underlying legislative intent. *Citizens Bank of Bryan v. First State Bank*, 580 S.W.2d 344, 348 (Tex.1979). Further, the contemporaneous construction of a statute by the administrative agency charged with its enforcement is entitled to great weight. *Dodd v. Meno*, 870 S.W.2d 4, 7 (Tex.1994); *Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex.1993). As noted, the Commission possesses the authority under section 27 to determine accounting classifications in order to carry out the provisions of PURA. And, the existence of the methods included in section 43 to ameliorate the impact of regulatory lag does not foreclose the Commission from authorizing deferred accounting pursuant to its authority under section 27. Rather, section 43 is a component of the overall scheme provided by PURA for regulating utilities and assuring that rates are just and reasonable. *See* TEX. REV.CIV.STAT.ANN. art. 1446c, § 2.[10]

## B.

### Regulatory Lag and the Financial Integrity Standard

Because deferred accounting alleviated the effects of regulatory lag, the State and the OPUC argue that the Commission violated the principle that regulatory lag is ordinarily an element of the risk associated with investment in a utility. While we agree that regulatory lag is ordinarily an element of risk for utilities, *Railroad Comm'n of Texas v. Lone Star Gas Co.*, 656 S.W.2d 421, 425 (Tex.1983), we do not accept that the legislature intended this general principle to subordinate the provisions of PURA. Rather, if the effects of regulatory lag infringe on the Commission's ability to regulate in a manner necessary to carry out the provisions of PURA, then the Commission may respond within its powers, both express and implied, under PURA to alleviate the impact of regulatory lag in order to fulfill its statutorily imposed duties. *See* TEX.REV.CIV.STAT.ANN. art. 1446c, § 16. At the same time, the authority to allow the deferral of post-in-service costs is not unfettered. Rather, the Commission must not alleviate regulatory lag unless necessary to comply with the provisions of PURA.

In Dockets Nos. 7560, 8230 and 9010, the Commission granted deferred accounting treatment in order to protect the financial integrity of CP & L and HL & P. The financial integrity of the utilities was at risk due to the effect of extraordinary regulatory lag.[11] Under PURA section 39, a utility must be allowed a reasonable opportunity to

9. The State and the OPUC claim that the four methods for reducing the effect of regulatory lag provided by PURA section 43 are exclusive. They include: (1) a time schedule within which the Commission must reach a decision in a rate case; (2) the authority to implement temporary rates during the pendency of a case; (3) the utility's ability to bond in proposed rates, without agency approval, by filing a bond adequate to protect customers if the agency ultimately approves a lower rate; and (4) the utility's ability to include construction work in progress (CWIP) in invested capital if necessary for its financial integrity. TEX.REV.CIV.STAT.ANN. art. 1446c, § 43.

10. The State argues that the Commission erred in its findings of fact that the alternatives provided in PURA section 43, *see supra* note 9, were not sufficient to protect the utilities from regulatory lag. As noted, PURA authorizes the Commission to order deferred accounting treatment of post-in-service costs. There is no requirement that the Commission first determine that no other method is adequate before invoking its authority to order deferred accounting. Thus, contrary to the State's position, the Commission is not re-quired to first find that the methods provided in section 43 would not sufficiently protect the utilities. *See Railroad Comm'n of Texas v. Lone Star Gas Co.*, 656 S.W.2d 421, 425 (Tex.1983). Rather, the proper inquiry is whether the Commission abused its discretion in ordering deferred accounting treatment in a particular case considering the surrounding circumstances, including the recognition that regulatory lag is ordinarily an element of risk associated with the utility. *Id.* at 427; *see infra* I.B.

11. We note that both HL & P and CP & L were faced with atypically long regulatory lag periods. Part of the extended periods were due to the existence at the time the dockets were pending of the "Big Cajun" rule. The "Big Cajun" rule required a utility to wait until after the end of a calendar quarter during which a new plant was in service before filing a rate case seeking inclusion of the plant in rate base. *See* Tex. Public Utils. Comm'n, *Application of Gulf States Utilities Co. for a Rate Increase*, Docket No. 5560, 10 TEX.P.U.C.BULL. 405, 420–23 (July 13, 1984). The rule exacerbated the effect of regulatory lag on a

recover its operating expenses together with a reasonable return on its invested capital. TEX.REV.CIV.STAT.ANN. art. 1446c, § 39; *Railroad Comm'n of Texas v. High Plains Natural Gas Co.,* 628 S.W.2d 753 (Tex.1981) (per curiam). This requirement is met only if the return is sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital. *Suburban Util. Corp. v. Public Util. Comm'n,* 652 S.W.2d 358, 362 (Tex.1983); *Federal Power Comm'n v. Hope Natural Gas Co.,* 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944); *Bluefield Water Works & Improvement Co. v. Public Serv. Comm'n of the State of West Virginia,* 262 U.S. 679, 692–93, 43 S.Ct. 675, 678–79, 67 L.Ed. 1176 (1923). Thus, the financial integrity standard applied by the Commission ensured that the utilities will receive an opportunity to recover the minimum rates mandated by PURA.

■ When an administrative agency is created to centralize expertise in a certain regulatory area, it is to be given a large degree of latitude in the methods it uses to accomplish its regulatory function. *City of El Paso v. Public Util. Comm'n of Texas,* 609 S.W.2d 574, 579 (Tex.App.—Austin 1980, writ ref'd n.r.e.). Section 16 of PURA grants to the Commission "the general power to regulate and supervise the business of every public utility within its jurisdiction and to do all things, whether specifically designated in this Act or implied herein, necessary and convenient to the exercise of this power and jurisdiction." TEX.REV.CIV.STAT.ANN. art. 1446c, § 16(a). The Commission determined that the financial integrity of the utilities was at risk and used a mechanism authorized by PURA to ensure that the utilities would receive the opportunity in a subsequent rate case to recover at least the minimum rates required by PURA.

■ Like any decision by the Commission, an order authorizing a utility to defer post-in-service costs is subject to review for an abuse of discretion. TEX.GOV'T CODE ANN. § 2001.174 (Vernon Pamphlet 1994); *Rail-*

*road Comm'n of Texas v. Lone Star Gas Co.,* 656 S.W.2d 421, 425 (Tex.1983). We hold that the Commission did not abuse its discretion by applying the financial integrity standard to determine whether to allow deferrals. The authorization of deferred accounting treatment is an appropriate response in such circumstances and is within the Commission's authority under PURA. TEX.REV.CIV.STAT. ANN. art. 1446c, §§ 2, 16, 38, & 39.

## II.

## Accounting Proceeding v. Rate Proceeding

■ Section 43(a) of PURA provides that no utility may make a change in its rates except by first filing a statement of intent with the regulatory authority having original jurisdiction. TEX.REV.CIV.STAT.ANN. art. 1446c, § 43(a). Section 3(d) defines the term "rate" as follows:

> The term "rate," when used in this Act, means and includes every compensation, tariff, charge, fare, toll, rental, and classification, or any of them demanded, observed, charged, or collected whether directly or indirectly by any public utility for any service, product, or commodity ... and any rules, regulations, practices, or contracts affecting any such compensation, tariff, charge, fare, toll, rental, or classification.

*Id.* § 3(d). The State argues that deferred accounting treatment is a "practice" that "affects compensation" and is therefore a "rate" as that term is defined by section 3(d). As a result, the State contends that the Commission erred in failing to follow the ratemaking procedures set forth in PURA section 43. We disagree.

By allowing deferred accounting treatment, the Commission authorized the utilities to recognize a deferred cost asset on its books until a subsequent rate hearing. At that subsequent hearing, the deferred cost asset will be evaluated just as any other asset before inclusion in rate base.[12] Thus,

---

utility because it increased the period from the time a plant began operations until the new rate

became effective. The "Big Cajun" rule has since been repealed.

**12.** The Commission's orders explicitly provide

only upon the issuance of a subsequent order by the Commission setting rates under PURA section 43 will the "practice" of deferred accounting treatment "affect" the utilities' "compensation."

We do not agree with the State's contentions that the orders, in fact, changed the rates because deferred accounting will necessarily result in increased rates in the future. Although we recognize that accounting practice and ratemaking procedure are inherently intertwined, they are two·distinct and separate concepts.[13] *See Office of Consumers' Counsel v. Public Util. Comm'n of Ohio*, 6 Ohio St.3d 377, 453 N.E.2d 673, 675 (1983). *See also Norfolk & Western Railway Co. v. U.S.*, 287 U.S. 134, 141–42, 53 S.Ct. 52, 54, 77 L.Ed. 218 (1932). The recording of deferred charges and the recovery of deferred charges are different acts. While we agree that accounting practices may impact future rates, we do not accept that all regulatory decisions that will have subsequent effects on rates are necessarily "ratemaking" proceedings under PURA section 43. See *City of El Paso v. Public Util. Comm'n of Texas*, 609 S.W.2d 574, 579 (Tex.App.—Austin 1980, writ ref'd n.r.e.). *See also Texas–New Mexico Power Co. v. Texas Indus. Energy Consumers*, 806 S.W.2d 230, 233 (Tex.1991) (recognizing that the "certificate of convenience and necessity affords only a right to begin construction, not a guarantee that every inefficient or imprudent expenditure will be passed on to the consuming public").

For example, if a certificate of convenience and necessity (CCN) to construct a new plant is granted, the costs of the new plant will eventually be considered in setting future rates. However, the approval of construction does not constitute a ratemaking proceeding

subject to PURA section 43. *See City of El Paso v. Public Util. Comm'n of Texas*, 609 S.W.2d 574, 579 (Tex.App.—Austin 1980, writ ref'd n.r.e.). When a CCN is granted, the utility receives the right to invest capital in an asset and upon completion of the asset, the amount of the investment found to be prudent will be placed in the utility's rate base. However, that asset will not be included in the utility's rate base until a rate hearing is conducted and the Commission determines that the costs of building the asset are prudent, reasonable and necessary and related to property that is used and useful in providing service. *See Texas–New Mexico Power Co. v. Texas Indus. Energy Consumers*, 806 S.W.2d 230, 233 (Tex.1991). Similarly, in providing the utilities' deferred accounting treatment for post-in-service costs, the Commission has allowed the utilities to begin recording a deferred cost asset. However, that asset will be subject to the same review as any other asset before inclusion in the utility's rate base. At a subsequent ratemaking proceeding, the Commission has retained the responsibility to determine what portion of the deferred expenses are properly chargeable to ratepayers with the burden of proving "the prudence and reasonableness of [each element of] its expenditures" firmly fixed on the utility. *See Coalition of Cities v. Public Util. Comm'n*, 798 S.W.2d 560, 563 (Tex.1990), *cert. denied*, 499 U.S. 983, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1991).

## III.

### A.

### Retroactive Ratemaking

 Fundamental in the utility ratemaking process is the principle that utility

---

that the deferred costs will be subject to review at a subsequent rate hearing and will be included in the rate base only to the extent that they are prudent, reasonable and necessary and are related to property that is used and useful in providing service. For example, the Commission provided in its order in Docket No. 7560 that:

> Capitalized costs will be subject to review by the Commission in CPL's subsequent ratemaking dockets. Those costs will be included in cost of service, and a return allowed on the unamortized balance, to the extent and only to the extent that the Commission determines that they are prudent, reasonable and neces-

sary expenses related to property that is used and useful in providing service.
Docket No. 7560, *supra* note 1, at 2740. *See also* Docket No. 8230, *supra* note 1, at 2822; Docket No. 9010, *supra* note 1, at 1960–65.

**13.** The Commission itself has differentiated between ratemaking proceedings and other utility regulation matters. *City of El Paso*, 609 S.W.2d at 579. The Commission's Rules of Practice and Procedure specifically provide different forms of pleadings and types of hearings for "rate setting hearings." *See* 16 Tex.Admin.Code § 21.

rates are set for the future, and not the past. *Railroad Comm'n of Texas v. Lone Star Gas Co.*, 656 S.W.2d 421, 425 (Tex.1983). Section 43(f) of PURA implicitly recognizes this principle by prescribing that rates set by order of the Commission "are thereafter to be observed...." TEX.REV.CIV.STAT.ANN. art. 1446c, § 43(f). The State and OPUC contend that by allowing costs incurred during the regulatory lag period to be deferred, the Commission has violated the rule against retroactive ratemaking implicit in PURA. We disagree.

The rule against retroactive ratemaking is often misunderstood and misapplied. Stefan Krieger, *The Ghost of Regulation Past: Current Applications of the Rule Against Retroactive Ratemaking in Public Utility Proceedings*, 1991 U.ILL.L.REV. 983, 988 (1991). The rule prohibits a public utility commission from setting future rates to allow a utility to recoup past losses or to refund to consumers excess utility profits. *Id.* at 984. Restated, the rule prohibits a utility commission from making a retrospective inquiry to determine whether a prior rate was reasonable and imposing a surcharge when rates were too low or a refund when rates were too high.

The State and OPUC argue that because the old rate is effective through the regulatory lag period, allowing expenses incurred during this period to be deferred and included in the rate base is tantamount to retroactive ratemaking. While we recognize that regulatory lag is ordinarily an element of the risk associated with investment in a utility, *Railroad Comm'n of Texas v. Lone Star Gas Co.*, 656 S.W.2d 421, 425 (Tex.1983), reducing the impact of regulatory lag does not equate to retroactive ratemaking. In the orders giving rise to this case, the Commission was not inquiring into the reasonableness of prior rates. Rather, the Commission's orders allowed the utilities to defer costs associated with construction and start-up of new power generation facilities. These costs were not a factor in the old rates. These orders do not allow the utilities to recoup losses resulting from previously set rates which were insufficient.

## B.

### Inclusion of Capitalized Post–in–Service Expenses in Rate Base

The State and OPUC next contend that the inclusion of post-in-service costs in a utility's rate base violates PURA Section 41(a), which sets out the components of a utility's rate base. A utility's rate base is its authorized level of invested capital. Ron Moss, *Ratemaking in the Public Utility Commission of Texas*, 44 BAYLOR L.REV. 825, 844 (1992). By statute, the utility is allowed to recover its reasonable and necessary operating expenses and both a return on, and a return of, its rate base. TEX.REV.CIV.STAT. ANN. art. 1446c, § 39(a). Texas follows the "original-cost" method of valuing a utility's rate base. Section 41(a) of PURA provides in pertinent part:

> Sec. 41. The components of invested capital ... shall be determined according to the following rules:
>
> (a) Invested Capital. Utility rates shall be based upon the original cost of property used by and useful to the public utility in providing service including construction work in progress at cost as recorded on the books of the utility.... *Original cost shall be the actual money cost, or the actual money value of any consideration paid other than money, of the property at the time it shall have been dedicated to public use, whether by the utility which is the present owner or by a predecessor, less depreciation.*

TEX.REV.CIV.STAT.ANN. art. 1446c, § 41(a) (emphasis added).

The State and OPUC contend that "property" as used in Section 41(a) refers only to the physical plant and the phrase "at the time it shall have been dedicated to public use" establishes a cutoff point—the original commercial operation date of the plant—for the calculation of the cost of the plant. As a result, they conclude that operating and maintenance costs and carrying costs incurred after the plant begins commercial operations cannot be included in the cost of the plant and thus cannot be included in the utility's rate base. We disagree.

■ In construing a statute, if the legislature does not define a term, its ordinary meaning will be applied. *Hopkins v. Spring Indep. School Dist.,* 736 S.W.2d 617, 619 (Tex.1987). By its ordinary meaning, the term "property" extends to "every species of valuable right and interest." *Womack v. Womack,* 141 Tex. 299, 172 S.W.2d 307, 308 (1943). It is "commonly used to denote everything which is the subject of ownership, corporeal or incorporeal, *tangible or intangible,* visible or invisible, real or personal." BLACK'S LAW DICTIONARY 1216 (6th ed. 1991) (emphasis added). "Property" as used in Section 41 includes intangibles.

This interpretation is further supported by the fact that intangibles are ordinarily included in a utility's rate base. *See* Ron Moss, *Ratemaking in the Public Utility Commission of Texas,* 44 BAYLOR L.REV. 825, 844 (1992). On the other hand, if the term "property" is interpreted to include only tangible property, then the inclusion in invested capital of *any* intangibles would be incongruous with the language of section 41 which sets out the components of invested capital.

Having concluded that the term "property" as used in section 41(a) includes intangibles, we next address the meaning of the phrase "dedicated to public use." The State and the OPUC argue that this language provides a cutoff date—when a plant begins commercial operation—after which no costs or expenditures can be included in a utility's rate base. Because "property" includes intangibles, the State's and OPUC's interpretation of "dedicated to public use" lacks a logical foundation. When read to include intangibles, section 41(a) values original cost at the time *any* property is first dedicated to public use—not when the physical plant is first dedicated. Thus, the contention that "dedicated to public use" refers only to the plant facilities is not persuasive. "Dedicated to public use" means the time that capital is invested for

utility purposes; i.e. when the expenditure is originally incurred.

This interpretation is consistent with the language of Section 41(a). The phrase "dedicated to public use" is immediately followed and qualified by the phrase "whether by the utility which is the present owner or by a predecessor." This language defines original cost as the cost of investment to the utility that first dedicates property to public use, ignoring subsequent transfers. Virtually identical language was interpreted in the same manner by the U.S. Supreme Court in *American Tel. & Teleg. Co. v. United States,* 299 U.S. 232, 57 S.Ct. 170, 81 L.Ed. 142 (1936). That case involved the Federal Communications Commission's system of accounts, which defined "original cost" as follows:

"Original cost" or "cost" ... means the actual money cost of (or the current money value of any consideration other than money exchanged for) property *at the time when it was first dedicated to the public use, whether by the accounting company or by a predecessor public utility.*

*Id.* at 238, 57 S.Ct. at 173 (emphasis added). The Court held that the purpose of the provision, among other things, was to prevent non-arm's length transfers between affiliates for the purpose of inflating rate base. *Id.* at 239, 57 S.Ct. at 173; *see also Office of Consumers' Counsel v. Public Util. Comm'n of Ohio,* 18 Ohio St.3d 264, 480 N.E.2d 1105, 1107 (1985) (interpreting similar language). The language included in section 41(a) was intended to achieve the same purpose, to value a utility's rate base at its original cost rather than at a current value that may be inflated by artificial transactions. The language was not intended to establish a cutoff date after which no costs could be included in the rate base. Consequently, we hold that Section 41(a) does not prohibit the inclusion in rate base of capitalized expenditures made after the commercial operation date.[14]

14. The State and OPUC also contend that inclusion of deferred costs in a utility's rate base violates section 41(a) because the deferred costs are not "used by and useful to the public utility in providing service...." TEX REV.CIV.STAT.ANN. art. 1446c, § 41(a). We disagree. By deferring costs that would otherwise not be recovered by

the utility, the utility is able to avoid heightened costs of capital and the possibility of missed dividend payments which would adversely impact the ability to raise equity capital. Further, the deferred costs, when incurred, were necessary to the continued operations of the utility plant in the first instance.

## C.

### Violation of the "Test Year"

■ The OPUC argues that the Commission's action also violated the test year requirement because it reached outside the test year to allow recovery of selective charges. Because we hold that the authorization to defer post-in-service costs is not the equivalent of a ratemaking function, this argument is misplaced. There is no requirement in PURA or the Commission's procedures that the Commission must follow a test year when determining accounting policy. *See* 16 TEX.ADMIN.CODE § 23.21(a) (West 1994).

## D.

### Single Issue Ratemaking

■ Further, the OPUC's contention that deferred accounting violates a general prohibition against "single issue" ratemaking is also without merit. The OPUC argues that the Commission cannot authorize the deferral of post-in-service costs without considering all relevant factors affecting the financial condition of the utility. The OPUC cites no section of PURA and no Texas authority to support its position. We reject this argument.

## IV.

### The State's Challenges

The State independently makes several arguments contending that the Commission's authorization of deferred accounting treatment was arbitrary, capricious, in excess of its authority, and violated the State's statutory due process rights. We will address each argument in the context of the applicable Docket.

## A.

### Dockets 7560 & 8230

In determining whether the post-in-service costs would impact the financial integrity of the utilities, the Commission did not inquire as to whether a portion of the post-in-service costs could be expensed without negatively impacting the financial integrity of each utility. Rather, the Commission considered the post-in-service costs of each nuclear plant in their entirety. Although the State recognizes that it will have an opportunity to dispute the reasonableness of the deferred expenses in a subsequent rate case, the State independently argues that the Commission acted arbitrarily and capriciously by precluding it from contesting whether the deferrals of 100 percent of the post-in-service costs were necessary to protect the financial integrity of the utilities.[15] The State also argues that the language of the Commission's orders forecloses any opportunity at the subsequent rate hearings to make these arguments.

■ An exercise of discretion by the Commission may only be reversed as being arbitrary and capricious if it constitutes a clear abuse of discretion. *See City of Carrollton v. Keeling,* 560 S.W.2d 488, 493 (Tex. Civ.App.—Dallas 1977, writ ref'd n.r.e.). Docket numbers 7560 and 8230 were not ratemaking hearings. Rather, in the context of a request for a change in accounting procedure, the Commission determined that the deferral of post-in-service costs associated with new nuclear generation plants was necessary to preserve the financial integrity of each utility. By making this decision, the Commission effectively segregated the costs associated with the nuclear plant from other costs of the utility for bookkeeping purposes. Because this was an accounting hearing, we do not agree that the Commission abused its discretion by ordering the deferral of the

---

**15.** The State specifically asserts that the Commission's orders did not preserve the ability to review whether "any or all" of the deferred costs were actually reasonable and necessary to protect the utilities' integrity. We interpret the State's argument to mean that the State did not have an opportunity to argue that only a portion of the costs associated with the nuclear genera-

tion plants were actually necessary to preserve the utilities' financial integrity. To the extent the State is arguing that the Commission foreclosed an opportunity to review whether the deferred costs, taken as a whole, were necessary to protect the utilities' financial integrity, that argument is without merit. The very purpose of the hearings in question was to determine that issue.

post-in-service costs on the utilities' books *in toto* until the subsequent rate hearing.[16]

However, we do agree that the language of the Commission's orders improperly forecloses any opportunity at the subsequent rate hearings to make these inquiries.[17] As noted, the decision to allow the deferral of post-in-service costs in order to protect the utilities' financial integrity was not an abuse of discretion. *See supra* I.B. At the same time, however, the financial integrity standard must not be used merely as a threshold inquiry that once met, is never considered again. Under our holding today, the Commission must not alleviate regulatory lag unless necessary to comply with the provisions of PURA. *See supra* I.B. While this requirement is met by application of the financial integrity standard in an accounting hearing, it cannot be disregarded at the subsequent rate hearing. Rather, at the subsequent rate hearing, after the Commission determines what portion of the deferred expenses were prudently and reasonably incurred and related to property used and useful in providing service, the Commission must then determine to what extent the deferred costs are necessary to preserve the utilities' financial integrity.

The State also contends that the Commission erred and abused its discretion by failing to balance the interests of consumers in deciding that the utilities should be granted deferred accounting. The PURA balances the important objective of protecting consumers from monopoly power with the need for financial stability which is required to attract the large amounts of investment capital essential to dependable utility service. TEX.REV.CIV.STAT.ANN. art. 1446c, § 2. *See Texas–New Mexico Power Co. v. Texas Indus. Energy Consumers,* 806 S.W.2d 230, 232 (Tex.1991). · When balancing the interests of consumers and utilities, the financial integrity of the utility weighs in favor of both sides. *See Southern Louisiana Area Rate Cases v. Federal Power Comm'n,* 428 F.2d 407, 435 (5th Cir.), *cert. denied,* 400 U.S. 950, 91 S.Ct. 243, 27 L.Ed.2d 257 (1970); *Public System v. Federal Energy Regulatory Comm'n,* 606 F.2d 973, 979 n. 27 (D.C.Cir.1979). If the utility is forced to pay higher costs of capitalization, the increased costs will eventually be borne by the consumer. The specific interests of the consumers are further protected because the deferred expenses will only be included in subsequent rates to the extent they are determined to be just and reasonable at a subsequent rate case. We reject the State's argument on this point.

Finally, the State argues that the Commission acted arbitrarily and capriciously by approving a deferral period of one year from the filing of the request. The State provides no supporting argument explaining why the length of the deferral period was improper. We refuse to speculate as to the State's

**16.** In Docket No. 8230, the State claims that its due process rights were violated because the Administrative Law Judge (ALJ) refused to consider a cost/benefit analysis that established that through deferred accounting treatment, HL & P would earn more money than if it followed legal ratemaking methodologies. Because the focus of the inquiry was on whether HL & P's financial integrity was at risk, evidence relevant to the eventual rates was not within the scope of the hearing. Further, to the extent that the State claims that the analysis would establish that deferred accounting would earn HL & P more than "legal" ratemaking methodologies, the basis for its argument is flawed as deferred accounting treatment is an authorized and "legal" action by the Commission. We note that deferred accounting is not a ratemaking action. *See supra* II.

**17.** The Commission's orders provide that the deferred costs will be subject to review at a subsequent rate hearing and will be included in the rate base only to the extent that they are prudent, reasonable and necessary and are related to property that is used and useful in providing service. However, the orders clearly foreclose the Commission from an opportunity to review the extent to which the deferred costs must actually be included in rate base in order to protect the utilities' financial integrity. For example, the Commission provided in its order in Docket No. 7560 that:

Capitalized costs will be subject to review by the Commission in CPL's subsequent ratemaking dockets. Those costs will be included in cost of service, and a return allowed on the unamortized balance, to the extent and only to the extent that the Commission determines that they are prudent, reasonable and necessary expenses related to property that is used and useful in providing service.

Docket No. 7560, *supra* note 1, at 2740. *See also* Docket No. 8230, *supra* note 1, at 2822; Docket No. 9010, *supra* note 1, at 1960–65.

arguments against the duration of the deferral period.

## B.

### Docket No. 9010

In Docket No. 8230, the Commission approved HL & P's request to allow the deferral of post-in-service costs from the date of commercial operation (August 25, 1988) and ending the earlier of either the date rates which reflect those costs became effective or November 23, 1989. The order also provided that "[i]f by November 23, 1989, rates are not in effect that reflect the prudently incurred costs of the plant, HL & P may file a petition with the Commission alleging what extraordinary circumstances, if any, exist which would warrant an extension of the deferral period beyond November 23, 1989." Docket No. 8230, *supra* note 1, at 2821–22. On August 11, 1989, HL & P filed a petition requesting continued deferred accounting treatment. Based upon a stipulated statement of facts and briefs of the parties, the Examiner's Report was issued denying HL & P's request on January 19, 1990. On February 24, 1990, the Commission overturned the Examiner's recommendations and approved HL & P's request to extend deferred accounting treatment.

■ The State contends that on June 9, 1989, HL & P implemented bonded rates and thus Docket No. 9010 was mooted because rates reflecting the costs of STP–1 were included in the bonded rates prior to November 23, 1989. The State notes that HL & P bonded its rates at an annualized $227 million increase on June 9, 1989. Contrary to the State's contention, however, the evidence in Docket No. 9010 assumed that bonded rates were in effect. *See* Docket 9010, *supra* note 1, at 1942–53 (Examiner's report, attachment B). Thus, the Commission concluded that the financial integrity of the HL & P was at risk even with the bonded rates. The State's argument fails.

The State also argues that the Commission erred in authorizing the extended deferred accounting treatment because although HL & P bonded its rates at $227 million, it could have bonded its rates in excess of $430 million. As a result, the State claims that if HL & P was not recovering all its costs, it was because of its own failure to use a legislatively granted remedy for regulatory lag. As noted, *see supra* note 10, HL & P was not required to utilize bonded rates authorized by PURA section 43 in order to request and receive deferred accounting treatment. Thus, the fact that HL & P did not bond in rates at the highest possible level does not preclude it from requesting and receiving deferred accounting treatment so long as its financial integrity is at risk.

The State next claims the Commission did not apply a financial integrity standard to Docket No. 9010, but instead applied a lower standard which considered financial ratios that did not establish that HL & P's financial integrity was at risk. We disagree. In two separate findings of fact, the Commission concluded that the evidence established that deferred accounting treatment was necessary to protect HL & P's financial integrity during the pendency of the rate proceeding. Docket 9010, *supra* note 1, at 1963 (Findings of Fact 22 & 23). Thus, the State's claim that the Commission applied an incorrect standard is without merit.[18]

■ The State further contends that there was not substantial evidence to support the Commission's finding in Docket No. 9010. We disagree.

At its core, the substantial evidence rule is a reasonableness test or a rational basis test. *Railroad Comm'n of Texas v. Pend Oreille Oil & Gas Co.,* 817 S.W.2d 36, 41 (Tex.1991). The reviewing court, then, concerns itself with the reasonableness of the administrative order, not the correctness of the order. *Id.* In applying this test, we may not substitute our judgment as to the weight of the evidence for that of the agency. *Id.* (the substantial evidence rule "prevents the court

---

18. The State's argument is, in actuality, a claim that there was not substantial evidence to support the Commission's decision. Although cloaked in terms of applying an incorrect standard, the State's primary support for its argument is that the evidence relied on by the Commission does not support a conclusion that HL & P's financial integrity was in jeopardy.

from 'usurping the agency's adjudicative authority even though the court would have struck a different balance'").

Although substantial evidence is more than a mere scintilla, the evidence in the record actually may preponderate against the decision of the agency and nonetheless amount to substantial evidence. *Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex.1984). The true test is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency. *Id.* The findings, inferences, conclusions, and decisions of an administrative agency are presumed to be supported by substantial evidence, and the burden is on the contestant to prove otherwise. *Id.* at 453; *Imperial Am. Resources Fund, Inc. v. Railroad Comm'n*, 557 S.W.2d 280, 286 (Tex.1977); *City of San Antonio v. Texas Water Comm'n*, 407 S.W.2d 752, 758 (Tex.1966).

The State makes two arguments supporting its claim that there was not substantial evidence to support the Commission's finding, neither of which overcomes the presumption that the Commission's order was supported by substantial evidence. First, the State argues that HL & P's mortgage indicators were almost identical with or without deferred accounting treatment. Thus, the State claims that the Commission's Finding of Fact number 22, that HL & P's mortgage indicators were inadequate to preserve HL & P's financial integrity, was not supported by substantial evidence. However, the Commission's Finding of Fact number 22 concluded that "the financial indicators in evidence in this case are inadequate to preserve HL & P's financial integrity during the pendency of its rate case." Docket 9010, *supra* note 1, at 1963. Thus, contrary to the State's implications, the Commission's finding was not based solely on the mortgage indicators. And, deferred accounting improved other financial indicators considered by the Commission. *See* Docket 9010, *supra* note 1, at 1942–53. Even if we agree that the mortgage indicators taken alone do not support the Commission's holding, our inquiry is whether the Commission's decision is

reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole. *Public Util. Comm'n of Texas v. Gulf States Utils. Co.*, 809 S.W.2d 201, 211 (Tex.1991). Thus, the State's attempt to focus on only one evidentiary factor supporting the Commission's holding is not persuasive.

Finally, the State argues that because the Commission did not adopt the Examiner's Report, it could not rely on the record evidence summarized in the Examiner's Report. As a result, the State claims that there was insufficient record evidence supporting the Commission's decision. This argument is entirely unfounded. In its final order, the Commission states:

> [T]he Examiner's Report is NOT ADOPTED. Instead, based on the record evidence as summarized in the Examiner's Report, the Commission issues the following Order: ....

The Commission is free to accept or reject the Examiner's recommendations. *See Ross v. Texas Catastrophe Prop. Ins.*, 770 S.W.2d 641, 642 (Tex.App.—Austin 1989, no writ). However, the rejection of the Examiner's recommendations does not prohibit the Commission from considering the evidence summarized in the Examiner's report.

## V.

### Conclusion

We hold that the Commission has the authority under PURA to authorize utilities to defer costs incurred during the regulatory lag period. We reverse the court of appeals to the extent that it disallowed the deferral of post-in-service carrying costs. Because of its erroneous conclusion that the deferral of post-in-service carrying costs violated PURA section 41, the court of appeals did not consider several arguments advanced by the State contesting the deferral of carrying costs, including that there was not substantial evidence to support the Commission's finding. Consequently, causes D–3154 and D–3155 are remanded to the court of appeals for consideration of the State's unresolved arguments. In all other respects, the judgments of the court of appeals are affirmed.

SPECTOR, Justice, joined by GONZALEZ, DOGGETT and GAMMAGE, Justices, dissenting.

Today the majority approves a creative accounting procedure that allows risk-free nuclear investment at the ratepayer's expense. By statute, a utility is entitled to earn a reasonable return on its invested capital, over and above its reasonable and necessary operating expenses. During the periods at issue in this case, however, a utility is not entitled—statutorily or otherwise—to recover its operating expenses; and under no circumstances is the utility entitled to reap a profit on those expenses. By erasing the line between capital and expenses, the majority converts the utilities' losses during the period before revised rates take effect into gains worth hundreds of millions of dollars. I dissent.

## I.

The Public Utility Commission is required to set a utility's revenues at a level that will allow the utility an opportunity to earn "a reasonable return on its invested capital used and useful in rendering service to the public over and above its reasonable and necessary operating expenses." Public Utility Regulatory Act ("PURA"), TEX.REV.CIV.STAT.ANN. art. 1446c, § 39(a) (Vernon Supp.1994). The valuation of its invested capital, or rate base, is thus critical in determining the amount that utilities are allowed to charge ratepayers.

PURA provides a simple mechanism for valuing a utility's rate base: valuation is based on "the original cost of property used by and useful to the public utility in providing service." § 41(a). "Original cost" is defined as the property's actual money cost "at the time it shall have been dedicated to public use, whether by the utility which is the present owner or by a predecessor, less depreciation." *Id.* This method could not be more straightforward; value is determined by looking to the property's cost as of the

time the plant is put into commercial operation.

This state's adoption of original-cost valuation represented a rejection of the previous valuation system, which looked to the "fair value" of a company's facilities. *See* Ron Moss, *Ratemaking in the Public Utility Commission of Texas,* 44 BAYLOR L.REV. 825, 854–57 (1992). The fair value system was widely criticized because it involved the "laborious and baffling" task of finding an exchange value for property that is "not commonly bought and sold in the market." *Missouri ex rel. Southwestern Bell Tel. Co. v. Public Serv. Comm'n,* 262 U.S. 276, 292, 43 S.Ct. 544, 548, 67 L.Ed. 981 (1923) (Brandeis, J., concurring, joined by Holmes, J.). Justice Brandeis urged an alternate approach to valuing rate base:

> The thing devoted by the investor to the public use is not specific property, tangible and intangible, but capital embarked in the enterprise. Upon the capital so invested the Federal Constitution guarantees to the utility the opportunity to earn a fair return.

*Id.* at 290, 43 S.Ct. at 547. This shift in focus was eventually adopted, in large part, throughout the country. *See* CHARLES F. PHILLIPS, JR., THE REGULATION OF PUBLIC UTILITIES 311 (2d ed. 1988).

In Texas, the shift toward "capital invested" came in stages. Before PURA, this Court—quoting at length from Justice Brandeis—concluded that the governing statutes required a "physical property valuation rate base." *Railroad Comm'n v. Houston Natural Gas Corp.,* 155 Tex. 502, 289 S.W.2d 559, 564, 567–68 (1956) (the *Alvin* case). With the enactment of PURA in 1975, the Texas Legislature likewise adopted the view that the valuation process should focus on the property actually embarked in the enterprise. *See* H. Louis Nichols and Randall Hagan Fields, *Rate Base Under PURA: How Firm is the Foundation?,* 28 BAYLOR L.REV. 861, 869–70 (1976) (stating that PURA codified the *Alvin* case).[1] In 1983,

---

**1.** PURA defines "facilities" to include "all tangible and intangible real and personal property without limitation." § 3(n). This broad definition, however, was *not* incorporated into PURA's

definition of rate base. *See* Nichols and Fields, 28 BAYLOR L.REV. at 874 ("Fortunately, this broad definition [of facilities] is not used in defining rate base under PURA. Valuations of 'intangible

the Legislature finally moved to a pure original-cost system, with cost fixed as of the date the property is dedicated to public use. PURA § 41(a); *see* Moss, 44 BAYLOR L.REV. at 856.

Apart from the simplicity of its administration, the original-cost system has the advantage that it is not subject to political manipulation. Under the fair-value system, the ratesetting authority could avoid a politically-sensitive rate increase by simply making an inflation adjustment to the rate base; the utility's nominal rate of return would remain the same, but consumers' electric bills would go up. *See* Moss, 44 BAYLOR L.REV. at 857. Original-cost valuation brings accountability to the ratesetting process: with value fixed at original cost, the Public Utility Commission must make adjustments to the rate of return. The original-cost method thus "sheds light on the ratesetting process and allows the public to discern the true rate of return." *Id.*

A pure original-cost method—with cost fixed as of the date of commercial operation—is also consistent with accounting rules regarding the treatment of carrying costs before and after the commercial operation date. Up until the plant begins operating, the utility may accrue carrying costs in its allowance for funds used during construction (AFUDC), which can later be included in rate base. After the commercial operation date, however, such costs must be expensed. As the court of appeals concluded in another of the three causes decided today, "simple logic" requires that valuation must occur at the time that AFUDC capitalization ceases— that is, at the date of commercial operation. *City of El Paso v. Public Util. Comm'n*, 839 S.W.2d 895, 914 (Tex.App.—Austin 1992), *rev'd*, 883 S.W.2d 179 (Tex.1994).

The majority today abandons this approach, without even acknowledging the court of appeals' reasoning. According to the majority, property is "dedicated to public use" within section 41(a) not at the date of commercial operation, but "when the expenditure is originally incurred," *supra* at 200, whether that occurs before or after the commercial operation date.

The most obvious problem with the majority's view is reconciling it with the language of the statute. If the Legislature had intended "original cost" to mean cost at the time of the expenditure, it could easily have said so, instead of referring to "the time [the property] shall have been dedicated to public use." Other language in section 41(a) indicates that the Legislature did not intend a "time of expenditure" construction: property can hardly be "used by and useful to the public utility in providing service" before the utility has even begun providing service.

The majority dismisses the "dedicated to public use" language on the ground that it was intended to prevent the property's value from being inflated by artificial transactions. *Supra* at 200 (citing *American Tel. & Tel. Co. v. United States*, 299 U.S. 232, 57 S.Ct. 170, 81 L.Ed. 142 (1936)).[2] The language was certainly intended to make actual capital investment simpler to ascertain; and the method chosen to accomplish that goal was to fix original cost at the commercial operation date. The majority provides no rationale for limiting the language's effect to the particular type of manipulation considered in *American Telephone & Telegraph*.

By ignoring clear statutory limitations on the definition of invested capital, the majority opens the door to other types of manipulation, including rate base manipulation by the Public Utility Commission to avoid rate increases. Rate base will now include, for

real and personal property without limitation' would be impossible without resort to capitalization of future earnings. This would lead to [the result Brandeis condemned].")

**2.** The majority also cites *Office of Consumers' Counsel v. Public Util. Comm'n of Ohio*, 18 Ohio St.3d 264, 480 N.E.2d 1105, 1107 (1985), stating that it was "interpreting similar language." *Supra* at 200. In fact, the language construed in

that case was decisively *different:* the Ohio statute refers to "cost ... to the person that first dedicated the property to the public use," and the court thus concluded that it "does not affect the timing of property valuation." The Texas statute, in contrast, provides that a property's original cost is determined "at the time it shall have been dedicated to public use"; so it can hardly be said that the statute does not affect the timing of property valuation.

example, all types of post-in-service carrying costs, which are largely dependent on interest rates. The rate base will thus be at least as manipulable as it was under the old fair-value system: an inflation adjustment will have the same type of distorting effect now that it had before 1983.

The majority has achieved, in short, exactly what original-cost valuation was designed to prevent: the inclusion in rate base of items that should in fact be classified as expenses. With deferred accounting, a utility's value is *greater* than its original cost—guaranteeing the utility a return greater than that authorized by the Legislature. *See Re Puget Sound Power and Light Co.*, 62 P.U.R.4th 436, 440 (Wash. Util. & Trans. Comm'n 1984).[3]

The majority understandably downplays the distinction between capital and expenses, asserting that "there is no inherent or fundamental characteristic that determines whether a particular expenditure is an expense or a capital investment." *Supra* at 194 n. 6. The authority the majority cites, however, states exactly the opposite. Professor Phillips describes the fundamental characteristics separating capital from expenses,[4] and warns against blurring the line between the two: "If these distinctions are not made, earnings can be inflated by charging operating expenses to capital, or concealed by charging capital to operating expenses. Again, uniformity is essential...." PHILLIPS, *supra*, at 206. The majority, disregarding this warning, allows the inclusion in rate base of such post-in-service items as operating and maintenance costs, which are by their very nature operating expenses—not invested capital.

The result of this judicial alchemy is that consumers will now be paying higher electric rates to compensate the utilities for expenses incurred in a period prior to the ratemaking proceeding. This result violates the most basic principle of ratemaking: rates are prospective only, so past losses are not recoverable under future rates. *See Railroad Commission v. Lone Star Gas Co.*, 656 S.W.2d at 425 (calling this a "fundamental principle"); *see also* Bonbright, PRINCIPLES OF PUBLIC UTILITY RATES 198 (2d ed. 1988) ("Nor as a general rule of ratemaking will a utility be allowed to set rates to recover past losses.").[5]

The majority acknowledges that this rule "prohibits a public utility commission from setting future rates to allow a utility to recoup past losses," *supra* at 199; but it insists that the orders in this case do not allow recoupment of past losses. This reasoning is sharply at odds with the generally-accepted accounting procedures on which the majority relies. *See supra* at 194 n. 5 and 194 (citing Statement of Financial Accounting Standards No. 71 (Fin. Accounting Standards Bd.1982)). Those accounting rules provide that deferred accounting is permissible only if "future revenue will be provided to permit recovery of the previously incurred cost rather than to provide for expected levels of similar future costs." FAS 71 ¶ 9.b. Thus, under the majority's own standards, deferred accounting *must* entail future recoupment of past losses.

Though today's ruling is cast in arcane terms, its bottom line is simple: the Public Utility Commission may now levy a surcharge on consumers to reward massive utility companies for expenditures the companies made during the regulatory lag period. If the utilities reap unexpected profits in the future, consumers—many of them facing fi-

---

3. "[A]ccrual of AFUDC after the in-service date of a utility plant would result in a utility plant with a value exceeding its 'original' cost. The original cost concept requires that the value of utility plant be determined at the time it is first placed in service to the public. To grant this petition would establish a dangerous and unwarranted precedent leading to further requests to disregard the original cost concept."

4. "Expenditures that represent investment in capital assets (plant and equipment) should be charged to fixed asset accounts rather than to operating expense accounts. Similarly, expendi-

tures that represent costs of doing business should be charged to operating expense accounts rather than to capital." PHILLIPS, *supra*, at 206.

5. In *Lone Star Gas Co.*, we recognized that a regulatory authority may set new rates to be effective as early as the time the authority assumed jurisdiction over the ratemaking proceeding. 656 S.W.2d at 426. In the present case, however, the majority approves a procedure whereby rates will reflect costs incurred long before the agency's jurisdiction attached.

nancial hardship—may rightly ask why they are not likewise entitled to an after-the-fact adjustment in rates.

## II.

Regulatory lag, in the context of public utilities, is not an evil to be eliminated. Because utility rates are based on historical data from a test year, "some lag is inherent in the process." *Lone Star Gas Co.*, 656 S.W.2d at 425. Moreover, to the extent that a utility must absorb its own costs during this period, regulatory lag provides a strong incentive for efficiency. *See* PHILLIPS, *supra*, at 383 (calling regulatory lag "[p]erhaps the most significant incentive to efficiency"). Regulatory lag is thus central to the basic purpose of utility regulation: to provide a monopoly market with an effective substitute for competition.

In rare instances, the regulatory lag period may be so protracted as to pose a threat to the utility's viability. The Texas Legislature has addressed that danger in section 43 of PURA, which "provides a detailed program in an attempt to compensate a utility for undue regulatory lag." *Lone Star Gas Co.*, 656 S.W.2d at 425. Section 43 places strict time limits on actions by the Public Utility Commission; authorizes the Commission to approve temporary rates; and permits the utility to institute new rates without the Commission's approval by filing a bond adequate to protect the customers if the Commission ultimately approves a lower rate. § 46(c)–(e). The Legislature adopted the present provisions in 1983, after giving special consideration to imminent rate cases on nuclear plants, and "recogniz[ing] that in extended rate cases you do need to make special accommodations." Debate on Tex.S.B. 232 on the Floor of the Senate, 68th Leg., R.S. 9 (April 6, 1983) (statement of Sen. Caperton).

The accounting maneuver approved today is not among the remedies chosen by the Legislature. In fact, had this maneuver been permissible in 1983, there would have been no need for any of the remedies in section 37. Deferred accounting treatment enables the Public Utility Commission to shift the *entire* burden of regulatory lag from shareholders to ratepayers. All lag-period costs—from the time a new plant goes into service until the time new rates go into effect—may now be included in the utility's rate base. Under such circumstances, the lag period will serve no efficiency role at all: a utility may not only recover all lag-period expenditures, but may actually earn a guaranteed return on those expenditures.

## III.

Among the fundamental problems with deferred accounting is a lack of meaningful standards for implementing it. The majority holds that deferred accounting is permissible "to protect the financial integrity" of a utility. *Supra* at 196. Unfortunately, the proceedings in the present cases confirm what past experience has shown: that the "financial integrity" standard is, in effect, no standard at all.

Docket 9010 demonstrates the approach typically taken by the Public Utility Commission in applying the financial integrity standard. The Administrative Law Judge in that case, after hearing all the evidence, submitted an Examiner's Report concluding that deferred accounting should be denied:

> Clearly, HL & P would be better off financially if the extension of deferred accounting were granted. That is not the issue, however. To balance the interests of utilities and their ratepayers, the Commission has decided to approve deferred accounting only if necessary to protect the utility's financial integrity. In this case, an extension of deferred accounting is not necessary to ensure HL & P's continued access to the capital markets on reasonable terms while its rate case is pending.

Texas Public Utils. Comm'n, *Petition of Houston Lighting and Power Company to Continue Deferred Accounting Treatment for STP Unit One Beyond November 23, 1989*, Docket No. 9010, 15 TEX.P.U.C.BULL. 1905, 1920 (Feb. 28, 1990). The Commission, however, overruled the Administrative Law Judge, and approved deferred accounting for the duration of the lag period—that is, until such time as the cost of South Texas Nuclear Project Unit 1 was included in rates. *Id.* at 1960. Commissioner Campbell dissented,

stating that "HL & P's own evidence shows that without an extension of deferred accounting it will be able to retain access to the capital markets on reasonable terms." *Id.* at 1966.

The indeterminate standard approved today is similar to one previously adopted by the Legislature in a related context. As enacted in 1975, PURA allowed the Commission to include in rate base expenditures on construction work in progress (CWIP) "where necessary to the financial integrity of the utility." Act of June 2, 1975, 64th Leg., R.S., ch. 721, § 41(a), 1975 Tex.Gen.Laws 2327, 2341. From the outset, this provision met with criticism, as in the following passage:

> The first question a consumer might pose is *when* will such an inclusion be "necessary to the financial integrity of the utility?" It is likely that the consumer will not be benefitted on this point, since it will be very easy for the Commission to *always* find it necessary to include utility construction work in the rate base, in order to strengthen the utility's "financial integrity," that is, to increase its profits.

H. Louis Nichols and Randall Hagan Fields, *Rate Base Under PURA: How Firm is the Foundation?*, 28 BAYLOR L.REV. 861, 878–79 (1976). The Legislature reconsidered the CWIP provision in 1983, recognizing the "widespread dissatisfaction" with the 1975 standard. Ron Moss, *Ratemaking in the Public Utility Commission of Texas*, 44 BAYLOR L.REV. 825, 848 (1992). It then adopted language that (1) provided that "construction work in progress is an exceptional form of rate relief"; and (2) shifted to the utility the burden of showing that inclusion of CWIP in the rate base was necessary to maintain the utility's financial integrity. Act of May 26, 1983, 68th Leg., R.S., ch. 274, § 1, 1983 Tex.Gen.Laws 1258, 1297 (amending PURA § 41(a)); *see also* Moss, 44 BAYLOR L.REV. at 849. The Public Utility Commission has recognized that the 1983 amendment requires a more stringent treatment of CWIP. Tex. Public Util. Comm'n, *Application of Gulf States Utilities Company for a Rate Increase*, Docket No. 5560, 10 TEX.P.U.C.BULL.

405, 435 (July 13, 1984); Moss, 44 BAYLOR L.REV. at 850 & n. 114.

Fortunately, today's decision, like the 1975 CWIP provision, may eventually be subject to legislative correction. Unfortunately, however, any such action will come too late to ease the burden today's decision places on millions of consumers.

\* \* \* \* \* \*

I would affirm the judgments of the court of appeals with regard to the disallowance of deferrals of post-in-service carrying costs. In all other respects, I would reverse the judgments of the court of appeals and hold that expenses incurred after the beginning of commercial operation cannot be capitalized and included in rate base.