NO. 07-10-00108-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

NOVEMBER 4, 2011

SOUTHWESTERN ELECTRIC
POWER COMPANY, ET AL., APPELLANTS

v.

PUBLIC UTILITY COMMISSION OF TEXAS, APPELLEE

FROM THE 261ST DISTRICT COURT OF TRAVIS COUNTY;

NO. D-1-GN-008-003871; HONORABLE LORA J. LIVINGSTON, JUDGE

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

**OPINION**

Southwestern Electric Power Company (SWEPCO) and Texas Industrial Energy Consumers (TIEC) appeal from the trial court's judgment affirming an order of the Public Utility Commission of Texas (the PUC) granting a certificate of convenience and necessity (CCN) to SWEPCO. We will affirm.

Factual and Procedural History

<u>The PUC Order</u>

On August 12, 2008, the PUC entered an order with which nearly all concerned parties were dissatisfied.  By a 2-1 vote, the PUC granted SWEPCO an amendment to its existing CCN permitting SWEPCO to build a coal-fired ultra-supercritical generating plant, referred to as the Turk plant, a few miles northeast of Texarkana, in Arkansas.  The PUC granted the amendment subject to specified conditions and caps on the future recovery of yet-to-be-incurred costs.

The Turk plant is planned as a generation facility that will serve both SWEPCO's retail and wholesale customers in three states.  Because SWEPCO intends to serve captive retail customers in Texas, it was required to seek a CCN from the PUC.  <u>See</u> 16 TEX. ADMIN. CODE § 25.101(b)(2) (2011) (Pub. Util. Comm'n of Tex., Certification Criteria).  In this context, SWEPCO is a hybrid entity–an electric utility monopoly obligated to serve captive Texas ratepayers in certain areas of the state and a power generation company competing in the multistate wholesale market.

<u>Litigation in the Trial Court</u>

SWEPCO was displeased with the cost caps and, therefore, sought judicial review of their legality.  TIEC sought judicial review contesting the PUC's determination of the necessity of the Turk plant.  The two cases were consolidated.  In the trial court, SWEPCO unsuccessfully contested the PUC's authority to impose the two caps at

issue. Equally unsuccessful, TIEC argued that the PUC improperly considered SWEPCO's wholesale load in determining the need for the Turk plant.

Just before the hearing in the trial court, SWEPCO filed a letter questioning whether its own issues relating to the cost caps were ripe for judicial review. SWEPCO pointed out that any effect from the caps would be felt only if (1) the plant was built and used to serve retail customers, (2) its prudent costs exceeded the cap and/or yet-to-be-passed legislation resulted in carbon containment costs in excess of the cap, and (3) the then-current PUC in some future rate case determined to follow the cost cap provisions. So, SWEPCO argued to the trial court, the issues might not be ripe and it *might* be asking the trial court to enter an unconstitutional advisory opinion.

The trial court suggested SWEPCO file a nonsuit in the case if it maintained that subject-matter jurisdiction was lacking. SWEPCO declined, and the trial court concluded that it did have subject-matter jurisdiction. The trial court affirmed the PUC order in all respects by judgment signed February 10, 2010.[1] This appeal followed and was originally filed in the Third Court of Appeals but, pursuant to the Texas Supreme Court's docket equalization efforts, was transferred to this Court. See TEX. GOV'T CODE ANN. § 73.001 (West 2005).

---

[1] As a prerequisite to obtaining judicial review of an administrative order, the appealing party must have filed a motion for rehearing in the underlying administrative proceeding. See TEX. GOV'T CODE ANN. § 2001.145(a) (West 2008); Hammack v. Pub. Util. Comm'n of Tex., 131 S.W.3d 713, 732 (Tex.App.—Austin 2004, pet. denied). It appears that this prerequisite was satisfied.

3

Appeal

SWEPCO's appeal stems from its request for a CCN amendment from the PUC, required when a utility in a still-regulated portion of the State provides service to a captive retail customer base. The PUC granted SWEPCO's CCN but did so with conditions the imposition of which, SWEPCO contends, was beyond the PUC's authority. TIEC appeals the same order, contending that the PUC did not have the authority to enter the order based on consideration of SWEPCO's wholesale load rather than solely on the capacity to serve captive retail customers. The PUC maintains that it has broad regulatory authority, broad enough to authorize it to grant the CCN amendment and to do so with the particular restrictions, especially in light of the complex transition-to-full-deregulation climate and considering that SWEPCO is a hybrid entity serving captive retail customers and competing in the wholesale market.

With that said, we must consider the following issues: (1) whether the PUC had the authority to consider SWEPCO's wholesale load in determining whether to grant the CCN and, if so, (2) whether the PUC had the authority to impose caps on what costs SWEPCO could recoup through rates applicable to captive Texas ratepayers. As a preliminary matter, though, we must decide (3) whether the issues concerning imposition of the cost caps are ripe for judicial review.

Ripeness

SWEPCO raises this issue, contending, as it did below, that the issue concerning the cost caps may not yet be ripe for review.[2] We address the issue of this Court's subject-matter jurisdiction first because, if we do lack jurisdiction to review the matter, review of the cost caps issue would be precluded. See Patterson v. Planned Parenthood of Houston & Se. Tex., Inc., 971 S.W.2d 439, 442 (Tex. 1998); Garrett Operators, Inc. v. City of Houston, No. 01-09-00946-CV, 2011 Tex. App. LEXIS 3583, at *6 (Tex.App.—Houston [1st Dist.] May 12, 2011, pet. filed).

SWEPCO contends that the contingencies built into the cost caps render the issues concerning the caps unripe. SWEPCO first points out that it has not sustained a concrete injury as a result of the cost caps. By its own admission, the construction cost estimates at the time of briefing was in excess by four percent of the caps, but, as it emphasized, those figures are simply estimates. Then, with respect to the cost caps relating to carbon dioxide emission control, SWEPCO contends that Congress has yet to pass federal legislation to govern this aspect of the plant's operation and, therefore, no one can determine the costs of compliance or, consequently, whether the cost caps

---

[2] SWEPCO's position on ripeness has been somewhat equivocal in that it advances the issue but, ultimately, maintains that, because this proceeding is a review of an agency action, the issue is ripe for review. It also urges, however, that both the Texas Supreme Court and the Austin Court of Appeals have issued opinions that would support the conclusion that the cost caps issue is not ripe. See Pub. Util. Comm'n of Tex. v. Houston Lighting & Power Co., 748 S.W.2d 439, 442 (Tex. 1987); Reliant Energy, Inc. v. Pub. Util. Comm'n of Tex., 153 S.W.3d 174, 183 (Tex.App.—Austin 2004, pet. denied). It also concedes, after urging that the legality of the cost caps is a question of law based on statutory construction and, thus, ripe for review in terms of prudence, that delay will likely not cause harm to SWEPCO so long as SWEPCO can later challenge the enforcement, if any, of the cost caps.

would negatively impact SWEPCO. SWEPCO relies on the doctrine of ripeness along with notions of judicial restraint to urge this Court to refrain from addressing the cost caps issue until such time that the negative impact of the cost caps, if any, are felt by SWEPCO.

Standard and Scope of Review

As an element of subject-matter jurisdiction, ripeness is reviewed *de novo*. See State v. Holland, 221 S.W.3d 639, 642 (Tex. 2007). The Texas Supreme Court has directed that we review all available information, including intervening events after a lower court's decision.[3] Perry v. Del Rio, 66 S.W.3d 239, 250 (Tex. 2001).

Applicable Law: Ripeness and Finality

In the context of review of an agency order, the issues of ripeness and of finality of the agency order are very nearly inextricably intertwined in the cases addressing them. The Austin court has recognized this interchangeable use: "[s]ome decisions speak of finality as a requirement for an administrative order to be 'ripe' for judicial review." Tex. Utils. Elec. Co. v. Public Citizen, Inc., 897 S.W.2d 443, 446 (Tex.App.— Austin 1995, no pet.) (citing Browning-Ferris, Inc. v. Brazoria County, 742 S.W.2d 43, 48–49 (Tex.App.—Austin 1987, no writ)).

---

[3] For this reason, it is worth noting that a considerable amount of ongoing litigation elsewhere surrounding the construction of the Turk power plant would open up the possibility that any effect of the cost caps may not be realized until well into the future, if at all. However, that issue, as we will discuss, is to be distinguished from the issue whether the PUC had the authority to impose those caps.

It would appear from the interchangeable use of the notions of "finality" and "ripeness" that a final order of this type from an agency will almost always present issues which are ripe for review, outside the more traditional notions of ripeness. However, there is no single rule that is dispositive of all finality/ripeness problems. We do, though, find some guidance from cases addressing ripeness in this particular context. We also keep in mind that a flexible approach must be employed, recognizing the need to both "minimize disruption of the administrative process and to afford regulated parties and consumers with an opportunity for timely judicial review of actions that affect them." Tex.-New Mex. Power Co. v. Tex. Indus. Energy Consumers, 806 S.W.2d 230, 232 (Tex. 1991).

At least one case has addressed the issue of a conditional amended CCN in terms of finality and ripeness. See id. In this case, the PUC made the amended CCN conditional on the utility obtaining the required permits from other agencies. Id. at 231. The Texas Supreme Court called for "a more pragmatic and flexible approach" to evaluating the finality of an agency's order. The court outlined the following "pragmatic and flexible" test:

> Although there is no single rule dispositive of all questions of finality, courts should consider the statutory and constitutional context in which the agency operates and should treat as final a decision "which is definitive, promulgated in a formal manner and one with which the agency expects compliance." 5 J. Stein, G. Mitchell & B. Mezines, Administrative Law 48-10 (1988). Administrative orders are generally final and appealable if "they impose an obligation, deny a right or fix some legal relationship as a consummation of the administrative process." Sierra Club v. United States Nuclear Regulatory Comm'n, 862 F.2d 222, 224 (9th Cir. 1988).

7

Id. at 232. The court observed that the PUC order at issue imposed a clear obligation on the utility and fixed its legal relationship and that certainly the PUC expected compliance. Id. at 233. The court concluded that the amended CCN, even though it contained some conditions, was final and appealable. Id. The court reiterated its recognition that the presence of a condition in a challenged order does not necessarily destroy its finality. Id. at 231. From this case, we see that the mere presence of a condition or a contingency in the agency order will not render the order non-final or unripe.[4] The "pragmatic and flexible approach" taken in Texas-New Mexico Power suggests that the issue concerning the cost caps is a ripe and final, appealable issue.

The Austin court applied Texas-New Mexico Power in a related context. See Office of Pub. Util. Counsel v. Pub. Util. Comm'n of Tex., 843 S.W.2d 718, 724 (Tex.App.—Austin 1992, writ denied).[5] This was a ratemaking case[6] rather than a CCN

---

[4] But see Houston Lighting & Power Co., 748 S.W.2d at 442. In Houston Lighting, the Texas Supreme Court held that issues related to the PUC's allocation of costs of still-pending litigation were not ripe for review. See id. The court directed the PUC to refrain from deciding the issue concerning the allocation of costs of litigation until such time as the litigation was resolved. See id. We note that Houston Lighting was decided prior to Texas-New Mexico Power and the issue involved the outcome of then-pending litigation, an issue both unresolved and outside any concerns surrounding construction, operation, or generation. So, we consider Houston Lighting somewhat factually distinguishable and to the extent that it is not and, instead, is directly applicable, we note our concern regarding Houston Lighting's precedential value in light of Texas-New Mexico Power.

[5] See TEX. R. APP. P. 41.3 (precedent in transfer cases).

[6] Utility ratemaking, like the CCN process, is governed by the Public Utility Regulatory Act (PURA). See TEX. UTIL. CODE ANN. §§ 36.001–.353 (West 2007 & Supp. 2010). One goal of the electric utility ratemaking process is to permit the utility "a reasonable opportunity to earn a reasonable return." Id. § 36.051 (West Supp. 2010); Pioneer Natural Res. USA, Inc. v. Pub. Util. Comm'n of Tex., 303 S.W.3d 363, 366 (Tex.App.—Austin 2009, no pet.). To achieve this goal, the PUC "must quantify the

case. Id. at 720. So, progress and construction were further along than in the instant case, and the purpose of the case was somewhat different. The PUC's order resolved the issues concerning construction expenditures and specified which expenditures were recoverable and could be passed on to ratepayers. Id. One of the two facilities at issue was constructed and operational, but the other was not. Id. at 721. The PUC's order applied to both, however, effectively determining, at least, a portion of the construction prudence issue "outside the confines of a rate case." Id. at 723. The Austin court held that, because PUC's order established a legal relationship among the parties, the issues were ripe for review. Id. at 723–24; see City of Austin v. Tex. Comm'n on Envtl. Quality, 303 S.W.3d 379, 385 (Tex.App.—Austin 2009, no pet.). To be final, the order at issue need not resolve all potential related controversies. Office of Pub. Util. Counsel, 843 S.W.2d at 723–24.

So, while no single rigid rule controls all questions of finality, the Texas Supreme Court's flexible, pragmatic approach demonstrates that, at the very least, a decision by an agency is final if it is (1) definitive, (2) promulgated in a formal manner, and (3) one with which the agency expects compliance. See Tex.-New Mex. Power, 806 S.W.2d at 232. We should also consider "the statutory and constitutional context in which the agency operates." Id. "Administrative orders are generally final and appealable if 'they

---

utility's invested capital used and useful in providing service to the public, the appropriate rate of return on that invested capital, and the utility's reasonable and necessary operating expenses." Pioneer Natural Res., 303 S.W.3d at 366; see TEX. UTIL. CODE ANN. § 36.051; Central Power & Light Co. v. Pub. Util. Comm'n of Tex., 36 S.W.3d 547, 552–53 (Tex. App.—Austin 2000, pet. denied).

impose an obligation, deny a right or fix some legal relationship as a consummation of the administrative process.'" Id. (quoting Sierra Club, 862 F.2d at 224).

At first glance, Atmos Energy Corp. v. Abbott, 127 S.W.3d 852, 858 (Tex.App.—Austin 2004, no pet.), could be read to support the conclusion that the issue is not ripe, as SWEPCO suggests. However, it is important to note that Atmos Energy dealt with a declaratory judgment rather than review of an agency's order. Atmos Energy and the instant case are distinguishable, then, in terms of procedural postures, injuries complained of, and remedies sought. But see Office of Pub. Util. Counsel, 843 S.W.2d at 723–24 (drawing on analogy between review of agency order and review of declaratory judgment). We see these same distinctions in the case cited by SWEPCO in a post-submission letter brief. See Robinson v. Parker, 54 Tex. Sup. Ct. J. 1640, 2011 Tex. LEXIS 637 (Aug. 26, 2011). From the majority of the cases, it appears that ripeness is examined somewhat differently in the administrative context than it is when declaratory relief is sought relating to as-yet unrealized events.

Analysis

Looking at the issue as relating to a function of an administrative agency rather than a declaratory judgment and treating the issue as one in which the PUC has already taken the complained-of action and the imposition of the caps is, in itself, the alleged injury, we conclude that the issue is ripe for judicial review. Further, under the most procedurally similar case of Texas-New Mexico Power, the PUC's order in the instant case satisfies the "more pragmatic and flexible" test for ripeness. That is, the PUC's order establishes a legal relationship and imposes rights and obligations with which, it

10

seems, the PUC expects compliance.  Further, as the Austin court has observed, the order at issue need not resolve all potential related controversies to be considered final. See Office of Pub. Util. Counsel, 843 S.W.2d at 723–24.  While there is authority that could be read to support the conclusion that the issues concerning imposition of the cost caps are not yet ripe for review, we conclude that the majority, and most procedurally similar, of the cases addressing ripeness of an agency order in a similar procedural posture support the conclusion that the issues are, indeed, ripe for our review.  We overrule SWEPCO's issue.

## Consideration of Wholesale Load

TIEC maintains that the PUC improperly took SWEPCO's wholesale load into consideration when it granted SWEPCO's CCN.[7]  More specifically, TIEC maintains that the PUC lacked the authority to consider SWEPCO's wholesale load in determining whether the Turk plant was necessary.  By doing so, TIEC contends, the PUC permitted SWEPCO the ability to subsidize its wholesale contracts by passing along excess costs to captive Texas ratepayers in certain regions of the state.  The PUC responds that it does have the authority to consider the wholesale load and, in response to TIEC's concerns regarding subsidizing, maintains that it built in the cost caps so that SWEPCO would have market-like incentives to keep costs down and restrictions on what costs could be passed along to the captive Texas ratepayer.  The PUC reads relevant

---

[7] One of the three PUC commissioners dissented to the order granting the amended CCN, agreeing with TIEC's position that the majority improperly considered SWEPCO's wholesale load when determining that the Turk plant was necessary.

11

statutory provisions to grant it authority to consider SWEPCO's wholesale load.[8]

SWEPCO agrees, maintaining that the PUC acted within its broad authority when

determining the necessity of the Turk plant, even considering that a portion of the

electricity generated by the plant would go to fulfill SWEPCO's wholesale contracts.[9]

Standard of Review

TIEC's contention calls on us to review an agency's interpretation of its authority.

As directed by the Texas Supreme Court, we "must determine the scope of the [PUC]'s

authority under the [PURA], both express and implied, and must determine whether the

[PUC]'s actions comported with this grant of authority." State v. Pub. Util. Comm'n of

Tex., 883 S.W.2d 190, 194 (Tex. 1994) (citing TEX. GOV'T CODE ANN. § 2001.174).

Section 2001.174 of the Texas Government Code, in pertinent part, provides the

following standard to be applied in this context:

> If the law authorizes review of a decision in a contested case under the substantial evidence rule or if the law does not define the scope of judicial review, a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:
>
> (1) may affirm the agency decision in whole or in part; and

---

[8] To clarify, we will frequently cite to three codes throughout our opinion: the Texas Utilities Code, the Texas Government Code, and the Texas Administrative Code. The relevant portions of the Texas Utilities Code will be referred to as PURA. See TEX. UTIL. CODE ANN. §§ 11.001–66.017 (West 2007 & Supp. 2010). The PURA is the PUC's enabling statute. See Coastal Habitat Alliance v. Pub. Util. Comm'n of Tex., 294 S.W.3d 276, 281 n.5 (Tex.App.—Austin 2009, no pet.).

[9] However, as we have mentioned and will discuss further, SWEPCO maintains that the PUC stepped outside its admittedly broad regulatory authority by imposing caps on what SWEPCO could recoup in terms of construction and emission controls.

(2) shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

    (A) in violation of a constitutional or statutory provision;

    (B) in excess of the agency's statutory authority;

TEX. GOV'T CODE ANN. § 2001.174 (West 2008).

With that in mind, we employ the general standards for statutory construction. Statutory construction is a question of law we review *de novo.* See Bragg v. Edwards Aquifer Auth., 71 S.W.3d 729, 734 (Tex. 2002). In construing a statute, we must ascertain the legislature's intent in enacting the statute. CenterPoint Energy Houston Elec., L.L.C. v. Gulf Coast Coalition of Cities, 252 S.W.3d 1, 16 (Tex.App.—Austin 2008), rev'd in part, aff'd in part sub nom. State v. Pub. Util. Comm'n of Tex., 344 S.W.3d 349 (Tex. 2011). In making this determination, courts look to the plain meaning of the words used in the statute. See id. When determining legislative intent, the entire act, not isolated portions, must be considered. Jones v. Fowler, 969 S.W.2d 429, 432 (Tex. 1998). We also consider the "object sought to be attained" by enacting the statute, the "circumstances under which the statute was enacted," the "consequences of a particular construction," and the interpretations of the statute made by an agency. TEX. GOV'T CODE ANN. § 311.023 (West 2005); see City of Austin v. Sw. Bell Tel. Co., 92 S.W.3d 434, 442 (Tex. 2002). We construe the text of an administrative rule under the same principles applicable to a statute. Phillips Petro. Co. v. Tex. Comm'n on Envtl. Quality, 121 S.W.3d 502, 507 (Tex.App.—Austin 2003, no pet.)

The PUC is an administrative agency, a creature of legislation, and, therefore, "has no inherent authority." Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd., 53 S.W.3d

310, 316 (Tex. 2001). The PUC possesses only those powers "expressly conferred upon it." Id. When conferring a power upon an agency, the Legislature also "impliedly intends that the agency have whatever powers are reasonably necessary to fulfill its express functions or duties." Id.; see Tex. Natural Res. Conserv. Comm'n v. Lakeshore Util. Co., 164 S.W.3d 368, 377–78 (Tex. 2005). However, an agency may not "exercise what is effectively a new power, or a power contradictory to the statute, on the theory that such a power is expedient for administrative purposes." City Pub. Serv. Bd., 53 S.W.3d at 316.

Deference Due the PUC's Statutory Interpretation

We must apply the foregoing standards for statutory construction in light of the deference due to an agency's interpretation of its governing provisions, and, for guidance in that undertaking, we look to the Texas Supreme Court's most recent application of deference to agency interpretation. See R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future and Clean Water, 336 S.W.3d 619 (Tex. 2011). The Austin court had remanded the case to the Railroad Commission so that it could reconsider its "public interest" determination using a broader definition of "the public interest." See Tex. Citizens, 254 S.W.3d 492, 503 (Tex.App.—Austin 2007, rev'd). On discretionary review, the Texas Supreme Court squarely addressed the issue presented as a statutory construction issue in which an agency interpretation was challenged. See Tex. Citizens, 336 S.W.3d at 623–25.

The court observed that, although the principle had been stated in different ways throughout the years, "[w]e have long held that an agency's interpretation of a statute it

14

is charged with enforcing is entitled to 'serious consideration.'"[10]  Id. at 624.  In clarifying what the "serious consideration" inquiry involved, the court concluded that "we will generally uphold an agency's interpretation of a statute it is charged by the Legislature with enforcing, 'so long as the construction is reasonable and does not contradict the plain language of the statute.'"  Id. at 625 (quoting First Am. Title Ins. Co. v. Combs, 258 S.W.3d 627, 632 (Tex. 2008)).

The court recognized that the parties in Texas Citizens advanced two competing interpretations, both with some merit.  Id. at 628.  However, the court concluded, "[i]t is precisely when a statutory term is subject to multiple understandings that we should defer to an agency's reasonable interpretation."  Id.  This deference is due especially when the subject matter of the provision at issue lies within the agency's specialized expertise.  Id. at 630; USA Waste Servs. of Houston, Inc. v. Strayhorn, 150 S.W.3d 491, 494 (Tex.App.—Austin 2004, pet. denied).  We see that this deference becomes even more appropriate when the statutory scheme at issue concerns a complex subject matter.  See R.R. Comm'n of Tex. v. Coppock, 215 S.W.3d 559, 563 (Tex.App.—Austin 2007, pet. denied).

---

[10] The Texas Supreme Court's deference to the agency interpretation in Texas Citizens is consistent with its longstanding position on the deference to be given to a specialized agency's interpretation of relevant statutes:  "When an administrative agency is created to centralize expertise in a certain regulatory area, it is to be given a large degree of latitude in the methods it uses to accomplish its regulatory function." State v. Pub. Util. Comm'n of Tex., 883 S.W.2d at 197; see also Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex., 253 S.W.3d 184, 202 (Tex. 2007) (Brister, J., dissenting); City of Corpus Christi v. Pub. Util. Comm'n of Tex., 572 S.W.2d 290, 297 (Tex. 1978).

The court reversed the Austin court's decision and, after examining the relevant statutory scheme, concluded that the Railroad Commission's interpretation of "public interest" was reasonable and, therefore, entitled to deference. Texas Citizens, 336 S.W.3d at 633. Ultimately, we learn from Texas Citizens that our task is to determine whether the agency's construction violates the plain meaning of relevant provisions and whether its interpretation is a reasonable one, not whether it is the only one or the best one. See id. That task begins by looking at the statutory language itself. Id.

Provisions related to the PUC's Authority

The PURA gave the PUC exclusive jurisdiction to regulate utility rates, operations, and services. Sw. Elec. Power Co. v. Grant, 73 S.W.3d 211, 216 (Tex. 2002) (citing TEX. UTIL. CODE ANN. §§ 32.001(a), 36.001(a) (West 2007), and Houston Lighting & Power Co. v. Auchan USA, Inc., 995 S.W.2d 668, 674 (Tex. 1999)). The PURA also gives the PUC "the general power to regulate and supervise the business of each public utility within its jurisdiction and to do anything specifically designated or implied by this title that is necessary and convenient to the exercise of that power and jurisdiction." TEX. UTIL. CODE ANN. § 14.001 (West 2007); State v. Pub. Util. Comm'n of Tex., 883 S.W.2d at 197 (quoting predecessor to Section 14.001).

The Texas Administrative Code echoes the broad power given by Section 14.001 when expressing the PUC's mission:

> The mission of the PUC is to assure the availability of safe, reliable, high quality services that meet the needs of all Texans [at] just and reasonable rates. To accomplish this mission, the PUC shall regulate electric and telecommunications utilities as required while facilitating competition, operation of the free market, and customer choice.

16

16 TEX. ADMIN. CODE § 25.1 (2011) (Pub. Util. Comm'n of Tex., Purpose and Scope of Rules) (emphasis added).

The Texas Utilities Code charges the PUC with protecting the public interest and grants the PUC authority to do so:

> Significant changes have occurred in the telecommunications and electric power industries since the [PURA] was originally adopted. Changes in technology and market structure have increased the need for minimum standards of service quality, customer service, and fair business practices to ensure high-quality service to customers and a healthy marketplace where competition is permitted by law. It is the purpose of this title to grant the Public Utility Commission of Texas authority to make and enforce rules necessary to protect customers of telecommunications and electric services consistent with the public interest.

TEX. UTIL. CODE ANN. § 11.002(c) (West 2007); see State v. Pub. Util. Comm'n of Tex., 883 S.W.2d at 194–95. More specifically, the PUC bears the burden of protecting the public interest during the process of deregulating the electricity industry:

> The legislature finds that the production and sale of electricity is not a monopoly warranting regulation of rates, operations, and services and that the public interest in competitive electric markets requires that, except for transmission and distribution services and for the recovery of stranded costs, electric services and their prices should be determined by customer choices and the normal forces of competition. As a result, this chapter[11] is enacted to protect the public interest during the transition to and in the establishment of a fully competitive electric power industry.

TEX. UTIL. CODE ANN. § 39.001(a) (West 2007). We add that courts acknowledge the PUC's discretion with respect to serving the public interest. In explaining the PUC's role

---

[11] Chapter 39 is entitled "Restructuring of Electric Utility Industry."

17

as the telecommunications regulatory body and its relationship as such to the public, the

Austin court made the following observation which we find instructive:

> Public interest determinations are dependent upon the special knowledge and expertise of the [PUC]. It is the [PUC]'s task to assess competing policies and determine what is in the public interest. The legislature intended the [PUC] to make whatever accommodations and adjustments necessary when determining what is in the public interest. In balancing these considerations, the agency is required to exercise its expertise to further the overall public interest.

> It is within the [PUC]'s authority to decide what public interest means in a particular case. The [PUC] has wide discretion in determining what factors to consider when deciding whether something serves the public interest.

Pub. Util. Comm'n of Tex. v. Tex. Tel. Ass'n, 163 S.W.3d 204, 213 (Tex.App.—Austin

2005, no pet.) (internal citations omitted).

In addition to the PUC's general authority, the Legislature granted the PUC

specific authority and duties in regard to the CCN process. For instance, the

Legislature has outlined the factors that the PUC may consider in making the decision

to grant or deny a CCN:

> (a) The commission may approve an application and grant a certificate only if the commission finds that the certificate is necessary for the service, accommodation, convenience, or safety of the public.

> (b) The commission may:

>> (1) grant the certificate as requested;

>> (2) grant the certificate for the construction of a portion of the requested system, facility, or extension or the partial exercise of the requested right or privilege; or

18

(3) refuse to grant the certificate.

(c) The commission shall grant each certificate on a nondiscriminatory basis after considering:

(1) the adequacy of existing service;

(2) the need for additional service;

(3) the effect of granting the certificate on the recipient of the certificate and any electric utility serving the proximate area; and

(4) other factors, such as:

(A) community values;

(B) recreational and park areas;

(C) historical and aesthetic values;

(D) environmental integrity;

(E) the probable improvement of service or lowering of cost to consumers in the area if the certificate is granted; and

(F) to the extent applicable, the effect of granting the certificate on the ability of this state to meet the goal established by Section 39.904(a) of this title.[12]

TEX. UTIL. CODE ANN. § 37.056 (West 2007). The Austin court has observed that Section 37.056 states the factors for the PUC's consideration in the "broadest possible terms." See Pub. Util. Comm'n of Tex. v. Texland Elec. Co., 701 S.W.2d 261, 266 (Tex. App.—Austin 1985, writ ref'd n.r.e)

The Texas Administrative Code contains the following provision specifically related to the CCN process. In pertinent part, it provides the following:

---

[12] Section 39.904(a) declares the State's goals of moving toward renewable energy technology. See TEX. UTIL. CODE ANN. § 39.904(a) (West Supp. 2010).

19

Certificates of convenience and necessity for new service areas and facilities. Except for certificates granted under subsection (e) of this section, the commission may grant an application and issue a certificate only if it finds that the certificate is necessary for the service, accommodation, convenience, or safety of the public, and complies with the statutory requirements in the Public Utility Regulatory Act (PURA) § 37.056. The commission may issue a certificate as applied for, or refuse to issue it, or issue it for the construction of a portion of the contemplated system or facility or extension thereof, or for the partial exercise only of the right or privilege. The commission shall render a decision approving or denying an application for a certificate within one year of the date of filing of a complete application for such a certificate, unless good cause is shown for exceeding that period.

16 TEX. ADMIN. CODE § 25.101(b).

The Legislature has recognized the changing climate of the electric utility industry and specifically found that development of a competitive wholesale electric market is in the public interest as is a set of rules and policies designed to protect the public's interest in a more competitive market:

The wholesale electric industry, through federal legislative, judicial, and administrative actions, is becoming a more competitive industry that does not lend itself to traditional electric utility regulatory rules, policies, and principles. As a result, the public interest requires that rules, policies, and principles be formulated and applied to protect the public interest in a more competitive marketplace. The development of a competitive wholesale electric market that allows for increased participation by electric utilities and certain nonutilities is in the public interest.

TEX. UTIL. CODE ANN. § 31.001(c) (West 2007).[13]

---

[13] The general outline of Texas's scheme for the transition from a regulated electric utility industry to a competitive marketplace has been addressed in detail. See Reliant Energy, Inc., 153 S.W.3d at 182 (citing Reliant Energy, Inc. v. Pub. Util. Comm'n of Tex., 101 S.W.3d 129, 133–36 (Tex. App.—Austin 2003) rev'd in part sub nom.

<u>Analysis</u>

The PUC's construction of relevant provisions is one that permits it to consider an entity's unregulated wholesale load when determining whether to grant the CCN. SWEPCO contends that the PUC's construction is a reasonable one.

The Legislature has found that a competitive market is in the public's interest and that it is also in the public interest to have rules in effect to protect the public as the competitive market develops. <u>See</u> <u>id.</u> The PUC has been charged with fostering "a competitive wholesale electric market that allows for increased participation by electric utilities" and, at the same time, protecting the public interest. <u>See</u> <u>id.</u>; <u>see also</u> <u>id.</u> §§ 11.002(c), 39.001. So, while the PUC's role with respect to the wholesale market is distinct from its role with respect to the still-regulated portion of the industry, the PUC is not required to turn a blind eye to the wholesale market considerations. <u>See</u> <u>Tex. Commercial Energy, L.L.C. v. TXU Energy, Inc.</u>, 413 F.3d 503, 506 & n.1 (5th Cir. 2005) (on PUC's role in Texas). We see the complexity of the PUC's role when it is charged with both regulating electric utilities as required "while facilitating competition, operation of the free market, and customer choice." 16 TEX. ADMIN. CODE § 25.1.

With respect to the CCN process, the PUC is given a lengthy list of broadly-stated considerations that go into its determination. <u>See</u> TEX. UTIL. CODE ANN. § 37.056. The PUC must apply this broadly-stated set of considerations in light of its general regulatory authority and its duty to consider and protect the public interest and in the

<u>CenterPoint Energy Inc. v. PUC</u>, 143 S.W.3d 81 (Tex. 2004), and <u>Reliant Energy, Inc. v. Pub. Util. Comm'n of Tex.</u>, 62 S.W.3d 833, 835–36 (Tex. App.—Austin 2001, no pet.)).

context of a legislatively-recognized changing climate of the electric utilities industry. See id. §§ 11.002(c), 14.001, 31.001(c), 39.001(a). The PUC is given the authority to "do anything specifically designated or implied by [PURA] that is necessary and convenient to the exercise of" its broad regulatory jurisdiction. Id. § 14.001. The PUC is then charged with protecting the public interest, specifically so when it is directed to apply the rules put into place to "protect the public interest during the transition to and in the establishment of a fully competitive electric power industry." Id. § 39.001(a).

Based on our examination of the relevant statutes operating among complex, diverse considerations involving a hybrid entity in an evolving industry, we cannot say the PUC's interpretation of its authority is unreasonable, nor does it appear to run contrary to the provisions that address the PUC's authority. We, therefore, defer to the PUC's interpretation that would permit it to consider wholesale load in making its determination whether the Turk plant is necessary. See Tex. Citizens, 336 S.W.3d at 625. Accordingly, we overrule TIEC's point of error.

Imposition of Cost Caps

As stated, the PUC granted SWEPCO's CCN amendment but did so with restrictions attached. Most of those restrictions and conditions are not contested as they are conditions typically associated with new generation facilities. But the PUC attached two cost caps which SWEPCO maintains were beyond the PUC's authority. Those two conditions are as follows: (1) construction costs in excess of $1.522 billion

22

could not be considered for inclusion in rate base,[14] and (2) carbon mitigation costs in excess of $28 per ton of carbon dioxide would be excluded from rates in Texas.

SWEPCO maintains that the PUC lacks the authority to impose such restrictions, or, at least, it lacks the authority to do so at this time.[15] SWEPCO's contention appears to be premised on the notion that the cost caps built into the CCN are more properly an issue belonging in a rate case. The PUC asserts the same discretion that would permit it to consider SWEPCO's wholesale load in this complex deregulation climate would permit it to impose cost caps to address the attendant concerns, those voiced by TIEC in the preceding issue, regarding subsidizing. That is, if the PUC may consider the wholesale load, then it may also consider ways of minimizing risks inherent in such consideration.

Standard and Scope of Review

Since this issue also deals with the PUC's construction of its own authority, we will apply the same standard of review we applied to the TIEC's contention concerning the wholesale load issue. We also grant the same deference to an agency's reasonable interpretation of its governing provisions. See Tex. Citizens, 336 S.W.3d at 625.

---

[14] The PUC concluded that "it is unreasonable to expect Texas retail consumers to be responsible for the Texas jurisdictional allocation of any additional costs that exceed $1.522 billion."

[15] One of the three commissioners agreed that the majority's imposition of the cost caps was improper and that the matter should be addressed in a ratemaking proceeding.

<u>Applicable Law: Not "Necessarily a Ratemaking Proceeding"</u>

The Texas Supreme Court, the Austin Court of Appeals, and the PUC itself have acknowledged that ratemaking proceedings are distinct from other types of proceedings. <u>See</u> <u>State v. Pub. Util. Comm'n of Tex.</u>, 883 S.W.2d at 198; <u>City of El Paso v. Pub. Util. Comm'n of Tex.</u>, 609 S.W.2d 574, 579 (Tex.Civ.App.—Austin 1980, writ ref'd n.r.e.). However, there appears to be room for some overlap: the Texas Supreme Court concluded that not "all regulatory decisions that will have subsequent effects on rates are necessarily 'ratemaking' proceedings under PURA." <u>State v. Pub. Util. Comm'n of Tex.</u>, 883 S.W.2d at 198; <u>see</u> <u>Office of Pub. Util. Counsel</u>, 843 S.W.2d at 723.

<u>Reviewing the PUC's Authority</u>

The provisions cited in discussion of the wholesale load issue are relevant to this issue as well. We emphasize that the PURA specifically permits the PUC to "grant the certificate for the construction of a portion of the requested system, facility, or extension or the partial exercise of the requested right or privilege." TEX. UTIL. CODE ANN. § 37.056; <u>see also</u> 16 TEX. ADMIN. CODE 25.101(b) ("The commission may issue a certificate . . . for the construction of a portion of the contemplated system or facility or extension thereof, or for the partial exercise only of the right or privilege."). We also keep in mind that, within the transition to a fully competitive electricity industry, the legislature has placed on the PUC "a uniquely difficult task." <u>Tex. Bldg. Owners & Managers Ass'n v. Pub. Util. Comm'n of Tex.</u>, 110 S.W.3d 524, 532 (Tex.App.—Austin

24

2003, pet. denied) (characterizing the PUC's duty in balancing rights within the telecommunications industry).

Further, it is well-established that the Legislature intends an agency created to centralize expertise in a certain regulatory area be given a large degree of latitude in the methods it uses to accomplish its regulatory function. See State v. Public Util. Comm'n, 883 S.W.2d at 197; City of Corpus Christi, 572 S.W.2d at 297; City of Garland v. Pub. Util. Comm'n of Tex., 165 S.W.3d 814, 819 (Tex.App.—Austin 2005, pet denied); see also City of Corpus Christi v. Pub. Util. Comm'n of Tex., 51 S.W.3d 231, 262 (Tex. 2001) (recognizing "that an administrative agency is entitled to considerable procedural flexibility").

Analysis

We again note that the Legislature granted the PUC broad regulatory authority, and the breadth of this authority is reflected in the PUC's mission. See TEX. UTIL. CODE ANN. § 14.001; 16 TEX. ADMIN. CODE § 25.1  We also note that the PUC is specifically authorized to grant a CCN in part. See TEX. UTIL. CODE ANN. § 37.056(b)(2); 16 TEX. ADMIN. CODE 25.101(b).  As the PUC operates within its general and specific areas of authority, it must bear in mind another aspect of its legislative authority: to protect the public interest. See TEX. UTIL. CODE ANN. §§ 11.002(c), 31.001(c), 39.001.  The PUC's interpretation that would allow it to impose cost caps to shield captive Texas ratepayers from costs in excess of an amount the PUC deemed reasonable is a reasonable interpretation of the PUC's own authority in light of these provisions.  Its interpretation is not only consistent with these provisions but also internally consistent with its

interpretation of its authority relating to consideration of wholesale load. That is, if it is within the public interest to foster a competitive free market and the PUC has the authority to consider the wholesale load when determining necessity for a facility, then it would follow that the PUC could impose cost caps as a means of fulfilling its legislatively-mandated duty that it protect the public interest during the deregulation process and the transition to a competitive market. See id. § 31.001(c).

Without question, the PUC can impose certain conditions in the CCN. See Tex.-New Mex. Power, 806 S.W.2d at 233. We have been asked to determine whether it can impose these particular conditions when they so closely resemble part of the ratemaking process.[16] Based on the following considerations, the PUC's construction of PURA provisions was reasonable: the breadth of legislature's grant of the PUC's authority, the specific attention the PURA scheme places on the deregulation climate, the specific authority granted to the PUC within that climate, and the authority to grant CCN requests in part. Because the PUC's interpretation of its authority appears to be reasonable and does not appear to run contrary to the PURA, we grant deference to the PUC's interpretation of this aspect of its authority as well. Accordingly, we overrule SWEPCO's point of error.

---

[16] While these caps do have a certain ratemaking scent to them, it appears from relevant provisions that the PUC's powers are broad enough with respect to protecting the public interest that, especially since the PUC can consider wholesale load in determining necessity under Section 37.056, the PUC can also take steps to protect captive Texas ratepayers from the very concerns expressed by TIEC regarding the potential for subsidizing wholesale dealings by passing along excess to captive ratepayers. Further, we see from State v. Pub. Util. Comm'n of Tex., 883 S.W.2d at 198, that not all actions taken with respect to the recoupment of costs necessarily belong in a ratemaking case.

Conclusion

Having overruled the points of error raised by SWEPCO and TIEC, we affirm the trial court's judgment.


                                        Mackey K. Hancock
                                            Justice